## S89A0061. LOLLEY v. THE STATE.
(385 SE2d 285)

PER CURIAM.

Alexander Lolley killed Randy Taylor with a knife. He was convicted of malice murder and sentenced to imprisonment for life.[1]

The evidence indicated that Lolley came home and found his wife in the company of another man. The man departed, and Lolley and his wife quarreled. Lolley struck his wife several times, and she fled. Lolley's sister was present and took Lolley's children to her home. Later that evening Lolley went to see Taylor, whom he suspected of an involvement with his wife during the previous year. According to a statement that he gave to law enforcement officers, Lolley had planned to divorce his wife, and hoped that he could persuade Taylor to testify as to his wife's misconduct, which he thought would help him to obtain custody of his children. Taylor refused to discuss the matter. A fight ensued, and Taylor was killed. The weapon was a knife some thirty inches long, commonly called a machete.

In the early morning hours of August 1, 1987, Lolley surrendered himself to the Turner County sheriff's office, stating that he had killed someone. He brought with him a knife that was covered with blood and hair, and asked the jailer to call the sheriff. When he ar-

---

[1] The homicide occurred on August 1, 1987, and Lolley was convicted and sentenced on May 5, 1988. His motion for new trial was denied on April 13, 1989, and his appeal docketed in this court on May 31, 1989. The case was argued on September 13, 1989.

rived, Lolley told the sheriff that he had killed Taylor, and added that if Taylor was not dead, he would go back and "finish the job."

A medical examiner testified that Taylor bled to death from multiple knife wounds. The evidence indicated that the hair and blood found on the cane knife were consistent with that of Taylor.

1. Lolley contends that the trial court erred in refusing to allow him to offer evidence that Taylor and Taylor's brother earlier had fought over a woman with whom they both were involved. Our cases have held that a victim's acts of violence to persons other than the defendant are inadmissible to prove the character of the victim for violence. *Bennett v. State*, 254 Ga. 162, 164 (326 SE2d 438) (1985). Accord *Harrison v. State*, 251 Ga. 837, 838-839 (310 SE2d 506) (1984); *Golden v. State*, 250 Ga. 428 (297 SE2d 479) (1982); *Music v. State*, 244 Ga. 832 (262 SE2d 128) (1979).

2. When Lolley surrendered himself, he volunteered to the jailer, with no prompting, that he had killed someone. Then he tossed a knife onto a desk. The jailer drew his weapon, and by telephone asked that the sheriff come to the jail immediately, with no further explanation. When the sheriff arrived, he observed that Lolley, who wore no shirt, had cuts over the upper portion of his body. A bloody knife was on a desk in front of the jailer. The sheriff asked of Lolley: "What have you got yourself into now, Alex?" Lolley responded that he had killed Taylor.

Lolley now insists that the trial court should have excluded these statements because he had not been advised of his right to remain silent under *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

(a) Assuming that Lolley was in custody when he made both statements, they are not subject to exclusion under *Miranda*. The initial statement to the jailer was spontaneous on Lolley's part, and clearly was not in response to any questioning of any kind. *Aldridge v. State*, 247 Ga. 142 (274 SE2d 525) (1981).

(b) As to the sheriff's inquiry, see *State v. Overby*, 249 Ga. 341 (1) (290 SE2d 464) (1982), for the rule that threshold, on-the-scene questioning is permissible though the "scene" is a custodial institution.[2]

> So long as the interrogation is not aimed at obtaining information to establish a suspect's guilt but is instead aimed at determining the nature of the situation upon the arrival of the policeman on the scene, some initial inquiry may, under the circumstances, be permissible before Miranda warnings

---

[2] In *Overby*, supra, we noted that questions such as "What happened?", or "What is going on?", may be asked without violating the rule of *Miranda*. Id. at p. 342.

are given. [*Aldridge*, supra at pp. 144-145.]

In our view, the sheriff's question falls within this category, and was not asked for the purpose of extracting incriminating information. There was no error.

3. Lolley insists that certain statements made by him after he was warned of his rights under *Miranda* should have been excluded because they were the result of the sheriff's coercive behavior. The trial court found otherwise. That finding is not clearly erroneous, and will not be disturbed on appeal. *Brown v. State*, 256 Ga. 439 (349 SE2d 738) (1986).

4. Lolley maintains that the trial court erred in refusing his request to charge the provisions of OCGA § 16-5-3 (a)[3] as a lesser included offense to murder. He insists that the jury could have found that he committed the unlawful act of reckless conduct, but did not intend to cause Taylor's death.

According to the evidence, Taylor suffered five knife wounds to the top and back of the head; five knife wounds to the arm and shoulder areas; at least two knife wounds to the legs; and fourteen knife wounds to the back.

> The unlawful use of the knife, a deadly weapon, while repeatedly stabbing the victim constituted the felony of aggravated assault; thus a charge on involuntary manslaughter would have been improper. [*Harris v. State*, 257 Ga. 385, 386 (359 SE2d 675) (1987).]

5. Other alleged deficiencies at trial were corrected by the trial court and do not provide grounds for reversal.

6. A rational trier of fact could have found Lolley guilty of malice murder beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

*Judgment affirmed. All the Justices concur, except Clarke, P. J., and Gregory, J., who dissent.*

WELTNER, Justice, concurring.

1. The majority has set out accurately the present state of the law of Georgia relative to the admissibility of evidence of specific acts of violence towards others. *Bennett v. State*, 254 Ga. 162, 164 (326 SE2d 438) (1985) (such evidence is inadmissible to prove the character of the victim for violence).[4]

---

[3] "A person commits the offense of involuntary manslaughter in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony."

[4] Accord *Harrison v. State*, 251 Ga. 837, 838-839 (310 SE2d 506) (1984); *Golden v. State*,

2. I concur specially inasmuch as I believe that this principle needs to be re-examined in the light of the relevance of such evidence.[5]

3. (a) In *Milton v. State*, supra, note 1, 245 Ga. at 22, we stated:

> The reputation or character for violence of a victim of homicide usually is irrelevant and inadmissible in a murder trial because it is just as unlawful to murder a violent person as it is to murder a nonviolent person.

That principle, *in vacuo*, is sound. There is, of course, no exception in the murder statute that would excuse the slaying of persons of bad character. As to relevance, the character of a victim who is robbed and killed by a total stranger has no possible bearing in a prosecution where the defense is alibi.

(b) In differing circumstances, however, evidence of the violent nature of a victim can be critically important to the discovery of truth. Consider these examples:

(i) The town ruffian, in a drunken and enraged state, advances upon a peaceable householder and threatens him with mayhem. The householder shoots him dead, even though no other weapon was in sight, and the erstwhile assailant was several yards distant from the householder. Where the defense is justification under OCGA § 16-3-21, what a defendant "reasonably believes" may be viewed by the factfinder in the light of what the defendant knew as to the dece-

---

250 Ga. 428 (297 SE2d 479) (1982); *Music v. State*, 244 Ga. 832 (262 SE2d 128) (1979).

Some of the reasons for this rule were stated in *Henderson v. State*, [234 Ga. 827 (218 SE2d 612) (1975)], at p. 829, as follows:

"(1) A single act may have been exceptional, unusual, and not characteristic and thus a specific act does not necessarily establish one's general character; (2) although the state is bound to foresee that the general character of the deceased may be put in issue, it cannot anticipate and prepare to rebut each and every specific act of violence; and (3) permitting proof of specific acts would multiply the issues, prolong the trial and confuse the jury." [*Milton v. State*, 245 Ga. 20, 22-3 (262 SE2d 789) (1980).]

Note, however, that precisely the same factors would militate against admission of evidence of similar crimes on the part of an accused, which is admissible to show "identity, motive, plan, scheme, bent of mind and course of conduct." *Wallace v. State*, 246 Ga. 738, 739 (273 SE2d 143) (1980). Uniform Superior Court Rule 31.3 requires notice to the defendant of the prosecutor's intent to introduce evidence of similar crimes. Compare Rule 31.4, requiring of a defendant the filing of a "Notice of Intent of Defense to Raise Issue of Insanity, Mental Illness or Mental Competency."

[5] In this case, Lolley's proffer of the earlier fight between Taylor and Taylor's brother would have shown that Taylor initiated the fight with his brother, who was wielding a car jack as a weapon, and that Taylor continued the fight even though he sustained a severe head wound. Lolley maintains that this evidence was offered to prove Taylor's nature for violence, and his capacity and determination to continue in violent combat although he was severely wounded. That evidence, he insists, is relevant in that it buttresses his own account of Taylor's acts of violence against him at the time of the homicide.

dent's character for violence. Logically, that knowledge is relevant, whether it was obtained by the defendant's painful personal experience at the hands of the decedent; by his observation of violent acts committed by the decedent upon another; by hearing of other specific acts of violence by decedent that were *not* committed in his presence; or by knowledge of the decedent's reputation for violence, unconnected to any specific act.

(ii) As a second example, the same ruffian approaches a stranger, and is killed by him. There are no eyewitnesses to the homicide. The defendant relates that the decedent advanced upon him in a drunken and enraged state, threatening him with mayhem. The decedent had no weapon. At trial, the defendant, who had no knowledge of the decedent before the killing, offers evidence of his violent nature, through specific acts of violence against third persons.

Here the principal question is the credibility of the defendant. Did it happen the way he related it? And why would the decedent make an unprovoked advance upon the defendant?

(c) In aid of this inquiry, evidence of the violent acts of the decedent would be of great relevance. That is no novel proposition, as in *Milton*, supra, we stated:

> Since specific acts of *defendants* may be introduced against defendants, this court should anticipate that other defendants reasonably will insist that they be permitted to prove specific acts of the *deceased* toward them. [Emphasis in text.] [245 Ga. at p. 25.]

As noted, however, in the past we have restricted evidence of specific acts of violence to those committed by the victim against the defendant. Yet, logic dictates no such distinction. Rather, the chain of reason proceeds as follows:

> A claims justification in that B committed acts of violence against A.

> A proves that B has committed prior acts of violence.

> B's prior violent acts are relevant to the question of whether A's account of violent acts by B against A is true.

It is the *act* of violence that is relevant, and not the identity of the victim. That relevance is found in this summary of human experience:

> "It is more probable that a person will act in accordance with his character (disposition) than that he will act contrary to

it." Green, Georgia Law of Evidence, § 65, p. 160. [*Henderson v. State*, supra, note 1, 234 Ga. at 830.]

Thus, a decedent's violent acts against a third party can be as relevant as his violent acts against a defendant in weighing the truth of a defendant's claim of justification.

(d) In *Haynes v. State*, 17 Ga. 465, 484 (1855), Chief Justice Lumpkin wrote:

> This Court stands pledged by its past history, for the abolition, to the extent of its power, of all *exclusionary* rules, which shut out facts from the Jury which may serve, directly or remotely, to reflect light upon the transaction upon which they are called upon to pass.

4. The rule reflected in *Bennett v. State* (supra, Division 1) ought to be changed to permit evidence of specific acts of violence against third persons in cases where a defendant claims justification.

I am authorized to state that Justice Bell and Justice Hunt join in this concurrence.

GREGORY, Justice, dissenting.

The defendant's argument is that the trial court erred in refusing to allow him to offer evidence that the victim had earlier fought with the victim's brother over a woman with whom they were both involved. This evidence would have shown that the victim instigated a fight with his brother using a car jack as a weapon, and that the victim continued to fight with his brother even after he had sustained a severe head wound. The defendant maintains that this evidence was not offered to prove the character of the victim for violence, and therefore does not fall within the rule that evidence of specific acts of violence perpetrated by the victim toward third parties is not admissible to prove the victim's character for violence. *Harrison v. State*, 251 Ga. 837 (310 SE2d 506) (1984). Rather, he argues that this evidence was offered for the limited purpose of proving a similar transaction between the victim and a third party.

The peculiar, but not unique, circumstance of this case which causes me to reach the conclusion that the evidence of the prior similar transaction is admissible here begins with a consideration of relevance.

Its relevance goes to the issue of the veracity of the exculpating portions of the defendant's statement. Here, as in most instances of murder where there were but two eyewitnesses (one, the deceased and the other, the defendant), the veracity of the defendant is critical to the fact-finding process. At first blush, one might suppose that a defendant in these circumstances has an advantage because the only

other eyewitness cannot testify, permitting the defendant to mold the "facts" at will. But experience suggests that fact-finders may tend to compensate (perhaps over-compensate) for this perceived advantage, by a skeptical approach to the defendant's veracity.

Let us suppose the case of an innocent defendant who honestly acted in self-defense, and killed to avoid being killed or seriously injured. His proof comes only from his own words, suspect though they are.

Proof that the victim was involved in another similar and violent transaction tends to support the defendant's contention that killing the victim was necessary to save his own life or prevent his serious bodily injury.

Here the circumstances were similar to the two transactions. There was a fight instigated by the victim over a woman in both instances. In the earlier situation the victim continued to fight even after suffering a severe head wound.

The evidence is relevant and that together with the policy reasons discussed make it admissible. Further, it tends to balance the right of the state to offer evidence of similar crimes against a defendant to prove intent, motive, scheme, or bent of mind.

I would overrule prior decisions inconsistent with this analysis. I am authorized to state that Presiding Justice Clarke joins in this dissent.

DECIDED NOVEMBER 9, 1989 —
RECONSIDERATION DENIED NOVEMBER 30, 1989.

*Gary C. McCorvey, N. Glenn Perry,* for appellant.
*David E. Perry, District Attorney, Ronald M. Adams, Assistant District Attorney, Michael J. Bowers, Attorney General, C. A. Benjamin Woolf,* for appellee.