## S91A0167. CHANDLER v. THE STATE.
### (405 SE2d 669)

BELL, Justice.

Deborah Jean Chandler was convicted of the malice murder of Anthony Bernard Ryan, and was sentenced to life imprisonment. Chandler was also convicted of possession of a firearm during the commission of a crime.[1] She appeals, and we affirm.

1. Appellant's sole defense to the charge of murder was justification. On appeal, she raises the general grounds regarding her murder conviction, and also contends the court erred in failing to direct a verdict of acquittal regarding the murder charge.

The standard for our review of these contentions is whether there was sufficient evidence for a rational trier of fact to have found appellant guilty of malice murder beyond a reasonable doubt. *Jackson v. Virginia,* 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). When viewed in the light most favorable to the verdict, the evidence was that appellant and Ryan lived together in Valdosta, Ga., and that

---

[1] The crimes were committed on May 26, 1989. Appellant was indicted October 23, 1989. The verdict was returned on June 5, 1990. Appellant filed her notice of appeal on July 5, 1990. On September 19, 1990, the court reporter certified the trial transcript, and on October 25, 1990, the clerk of the trial court certified the record. The clerk of this Court filed the record on November 6, 1990, and on January 22, 1991, the appeal was orally argued.

Ryan was the father of one of appellant's children. Ryan and appellant's relationship was tempestuous, and on numerous occasions Ryan physically abused appellant. After he beat her the day before the killing, she decided to end their relationship. On the morning of the killing, she returned his clothing to his sister, Sharon Ryan, telling the sister that appellant's relationship with the victim was over. Sharon Ryan said she noticed no scratches or marks on appellant. Later that day Sharon Ryan told the victim that she had his clothes.

Appellant subsequently drove to the courthouse in Valdosta to obtain a warrant against Ryan. According to appellant, the victim encountered her on her way there and followed her, harassing her with his car and throwing a milk carton inside her car. At the courthouse Ryan confronted her on foot and beat her. After the beating appellant attempted to obtain a warrant at the courthouse and the police station, but without success. While at the courthouse she told a sheriff's lieutenant who tried to help her:

> Sir, that's all right. I'm just tired of all of this. I'm tired of being beat up. And if it happens again, I'll take care of the situation.

Appellant subsequently met with a friend, Patricia Miller. According to Miller, appellant told her

> she wanted to get a gun in case he came back bothering with her because she was real scared. She was real upset. So, we sat there and we talked a long time. So, I told her, well, to protect herself, she should get a gun.

Miller then drove appellant to a Valdosta pawn shop where, shortly after 6:00 p.m., she purchased the .38 caliber pistol she later used to kill the victim. She told the man who sold her the pistol that

> she had been beaten up and she was trying to purchase a weapon. She was, you know, in fear. She was shaken up and was wanting a weapon to protect herself with.

She also told the man she was buying the gun to protect her child and her rights.

After appellant purchased the gun, Miller drove her to Lakeland, Ga., where they arrived about 6:30 or 7:00 p.m. Appellant and Miller testified that the purpose of the trip was to pick up Miller's mother. However, Miller admitted she had told Sharon Ryan after the shooting that it was appellant's idea to go to Lakeland. In Lakeland they drove a total of three times to the Three Oaks Club. Appellant said she had never known Miller's mother to be at the club, but knew that

if the victim were in Lakeland, it was likely he would be at the club. On the first two visits to the club, appellant saw the victim. After the first visit they encountered Sharon Ryan, who was standing by the road in front of her house. Appellant told her about the victim beating her at the courthouse, and informed her that she was tired of fighting with him. Appellant took out the pistol and loaded it, and at that point Sharon Ryan told her, "Well, just do whatever you have to do."

On their third visit to the club, Miller and appellant were accompanied by a third woman, Sue Gail Warren Everett. Miller was driving, and appellant was in the front passenger seat. At the club they encountered Timothy Riley, who talked with them through appellant's window while they sat in the car. Riley said the victim then walked up to the car, with "a serious look on his face, straight enough for me to get up." After Riley yielded his place at appellant's window, the victim leaned through the window, so that his body from the waist up was inside the car. According to appellant, Miller, and Everett, the victim began to beat appellant, even though the three women shouted at him to stop. Riley was nearby and saw the victim leaning into the car. Riley was unable to see whether the victim was beating Miller, but he did testify that he heard no yelling. While the victim was leaning into the car, appellant fired her pistol five times, striking the victim twice. One of the two shots that hit him wounded his left arm, and the other shot fatally wounded him in the chest. The shooting occurred at approximately 11:00 p.m. At trial, Everett admitted that before trial she, Miller, and appellant had talked over what their testimony might be.

There was disputed testimony concerning the extent to which the alleged beating appellant received from the victim caused any injury to appellant. A police officer, Robert Ryan, who was at the club shortly after the shooting observed no bruises or scratches on appellant. Bryan Graves of the Georgia Bureau of Investigation took a statement from appellant approximately three hours after the killing, and at trial described her physical condition as follows:

She had one — I guess the best way to describe it would be a scrape right between her eyes. Her blouse — she had on a white pullover type blouse. It was torn at the shoulder, there were blood stains on it. The only injury I observed was the single scratch between her eyes.

Q Was it a bleeding scratch?

[Graves] You could see red in it, but there was no blood coming out of it. It was a fresh type scratch.

. . .

Q Did she have any particular complaints about being hit in any particular part of the body?

[Graves] No, sir, she did not.

Q Did you notice any bruises, lacerations, other than the one to her brow?

[Graves] No, sir, that was the single wound of any type that I saw.

. . .

Graves also saw appellant about two days later, and noticed no swelling. He testified he saw "nothing different at all than what I'd seen before."

Appellant testified at trial. During cross-examination the following colloquy occurred:

Q And you say there was this fight between you and Anthony [the victim].
A Uh-huh (affirmative response).
Q You didn't just sit there — you didn't sit there and just take it.
A Yes, I fought back for a while.
Q You fought back, too.
A Uh-huh (affirmative response).
Q Now, nobody said that you had any black eyes, any busted nose, any busted lip, any anything, and that's about the truth.
A I wonder why, too. I wonder why nobody said that, too. I don't understand that either because I did. I had two black eyes. My face was swole [sic]. They took pictures of me. I had gunpowder on the back of my neck. I don't even know where [are] the pictures that they took of me.[2] . . . I don't really know what's going on here. I don't know whether people want to get to the bottom of the truth or not.
Q I think these people in the jury box do. So, it's your testimony that Bryan Graves was lying —
A Yes.
Q — when he said that your face wasn't swollen and didn't have any signs on it.
A Yes.

---

[2] The purported photographs that appellant referred to are not part of the record.

Q That wasn't the truth.

After reviewing this evidence, we are not unsympathetic to the plight of appellant, as it is undisputed that she was repeatedly and seriously physically abused by Anthony Ryan. However, our focus must be whether, on the particular occasion that she killed Ryan, her conduct was justified.

If the testimony of appellant and Miller were credited concerning the purpose of their trip to Lakeland, and if the testimony of appellant, Miller, and Everett were credited concerning whether Ryan was beating appellant at the time of the shooting, we would be faced with a closer question of justification.

However, the jury was entitled to disbelieve appellant's and Miller's ostensible purpose for going to Lakeland, as it is belied in several respects. There was evidence that appellant and her companions drove to Lakeland within an hour of the purchase of the gun. Although Miller testified that going to Lakeland was her idea, she admitted she told Sharon Ryan the idea was appellant's. Miller and appellant drove straightaway to the Three Oaks Club, even though they knew that Miller's mother did not go there and that the victim was likely to be there if he was in Lakeland. On that first ride to the club they saw the victim, and yet returned twice more and stopped at the club the third time, despite knowing the victim's recent propensity to confront and attack appellant. Moreover, appellant loaded her pistol after the first visit, which would indicate she was expecting trouble with the victim. In addition, Everett admitted before trial that she, Miller, and appellant had talked about their testimony. Under these circumstances, the jury was authorized to conclude that appellant deliberately sought out the victim soon after purchasing the pistol, for the purpose of shooting him.

Moreover, the jury was entitled not to credit the testimony of appellant, Miller, and Everett concerning whether Ryan beat appellant after he leaned into the car. Their testimony conflicts with the testimony of Graves and Officer Robert Ryan, both of whom observed little or no evidence of the injuries one would expect appellant to have suffered from the alleged beating. Appellant testified she had two black eyes and a swollen face, but did not attempt to explain Officer Ryan's testimony, and asserted as her only explanation for the testimony of Graves[3] that he lied. We find that, given this conflict concerning whether the appellant exhibited any substantial injuries of

---

[3] Graves' testimony is arguably more significant in this regard than Officer Robert Ryan's, as Graves saw her about three hours after the alleged beating, which was a point where any bruises, swelling, or other injuries that might result from a beating should have become manifest.

the alleged beating the victim gave her before she shot him, the jury was authorized to conclude that he was not beating her when she shot him.[4]

The testimony of appellant, Miller, and Everett also conflicts with Riley's testimony. The three women averred that each one of them yelled at the victim to stop beating appellant, whereas Riley said he heard no yelling. The jury was authorized to believe Riley's testimony, and rely upon it as an additional reason to conclude the victim was not beating appellant at the time she shot him.

In light of the evidence that appellant was not being beaten when she shot the victim, taken in conjunction with the evidence that appellant deliberately sought out the victim to shoot him, we find the jury was authorized under the test of *Jackson v. Virginia*, supra, to conclude that appellant was not justified in shooting the victim and that she was guilty of malice murder.[5]

2. The standard of *Jackson v. Virginia*, supra, was also satisfied with respect to appellant's conviction of possession of a firearm during the commission of a felony.

3. Appellant contends the trial court erred by excluding evidence of a prior violent act by Ryan toward a third party, as, she argues, the prior act would have been relevant to her defense of justification.

(a) Under current law this enumeration has no merit, *Hill v. State*, 259 Ga. 655 (4) (386 SE2d 133) (1989), and therefore presents no reason to reverse the judgment in this case.

(b) However, after further consideration of this issue we are now convinced the rule concerning prior specific acts of violence by the victim should be changed for future cases to comport with the special concurrence of Justice Weltner in *Lolley v. State*, 259 Ga. 605, 607-610 (385 SE2d 285) (1989). In his special concurrence to *Lolley*, Justice Weltner cogently explained why this Court ought to change the rule. We now find his reasoning persuasive and hold that, as of the date this opinion is published in the advance sheets (September 12, 1991), evidence of specific acts of violence by a victim against third persons shall be admissible where the defendant claims justification.

(c) Now that we will permit a defendant claiming justification to introduce evidence of specific acts of violence by the victim against third persons, we find it necessary to impose procedures to govern the introduction of such evidence.

In deciding to impose the procedures, we find guidance in Uni-

---

[4] The scratch on appellant's face and her torn blouse could have resulted from aggressive action by the victim that fell short of conduct that would justify appellant's use of the pistol.

[5] We note that appellant did not attempt to introduce any expert evidence of the "battered woman syndrome." See *Smith v. State*, 247 Ga. 612 (277 SE2d 678) (1981).

form Superior Court Rule (USCR) 31.1, which requires the prosecuting attorney to give advance notice of the state's intention to use evidence of similar transactions or occurrences. As we indicated in *Loggins v. State*, 260 Ga. 1, 2 (2) (388 SE2d 675) (1990),

> [t]he purpose of the time requirement of USCR 31.1 is fundamental fairness. The rule recognizes the difficulty of rebutting evidence of specific acts unless timely notice of the state's intention to offer evidence is given.

Similarly, it is foreseeable that permitting a defendant to introduce evidence of specific acts of violence by the victim without advance notice to the state would result in unfairness to the state, see generally LaFave & Israel, Criminal Procedure, § 19.4 (West 1984), and that curative procedures to avoid a battle by surprise eventually will be incorporated into the USCR. Because the need for such procedures should be met in the interim, we hereby direct that a defendant claiming justification and seeking to introduce evidence of specific acts of violence by the victim against third persons will notify the trial court of such intention prior to trial. The trial court will take reasonable steps to assure that the state has reasonable notice of such intention and of the nature of such evidence. Thereafter, the trial court will take similar reasonable steps to assure that the defendant has reasonable notice of the state's intention to introduce evidence in rebuttal of the defendant's evidence of the victim's acts of violence, and of the nature of such rebuttal evidence.

4. Appellant enumerates as error the trial court's exclusion of a letter appellant wrote to a third party on the day she killed the victim. We find this enumeration presents no error, as appellant has effectively abandoned it by failing to make the contents of the letter available for this Court's review.

5. Appellant argues an expert for the state should have been allowed to testify about results of a test that was performed by other persons. We hold that because his testimony would have been hearsay, the trial court did not err by excluding it.

*Judgment affirmed. All the Justices concur, except Smith, P. J., and Benham, J., who concur specially as to Division 3.*

BENHAM, Justice, concurring specially.

I concur in the majority opinion and the judgment with one exception. I do not agree with that portion of Division 3 which adopts the reasoning of Justice Weltner's special concurrence in *Lolley v. State*, 259 Ga. 605, 607 (385 SE2d 285) (1989), and holds that henceforth "evidence of specific acts of violence by a victim against third persons shall be admissible where the defendant claims justification."

It is important to recognize that the rule advanced by the majority is not limited to the "similar transactions" rationale advanced by Justice Gregory in his dissent to *Lolley*, supra. If the new rule announced by the majority were to be considered as an attempt to "balance the right of the state to offer similar crimes against a defendant to prove intent, motive, scheme, or bent of mind" (see *Lolley*, supra, dissent of Justice Gregory at 610, 611), the better way to level the playing field would be to return to the days when the admission of similar transaction evidence was a limited exception to the rule against putting the defendant's character in issue, rather than the separate rule it has become. The position adopted by today's majority is, instead, a much more fundamental break with existing authority[6] and is a move to replace trial by evidence with trial by character assassination. When applied to homicide cases, this revolutionary change in the law of evidence is a throwback to frontier days and gives judicial sanction to a new defense to murder: the victim "needed killing."

It is well put in *Harrison v. State*, 251 Ga. 837 (3) (310 SE2d 506) (1984), that, "[g]enerally the character of a victim is not admissible, it being as unlawful to kill a violent person as to kill a nonviolent person." See also *Bennett v. State*, 254 Ga. 162 (3) (326 SE2d 438) (1985). In *Henderson v. State*, 234 Ga. 827 (1) (218 SE2d 612) (1975), this court noted that the

> reasons for the rule prohibiting proof of specific acts of violence appear to be at least threefold: (1) A single act may have been exceptional, unusual, and not characteristic and thus a specific act does not necessarily establish one's general character; (2) although the state is bound to foresee that the general character of the deceased may be put in issue, it cannot anticipate and prepare to rebut each and every specific act of violence; and (3) permitting proof of specific acts would multiply the issues, prolong the trial and confuse the jury. [Cit.]

By ignoring the reasons enumerated in *Henderson*, the majority invites trial by ambush. And even if the State expends the resources necessary for a complete background investigation of the victim, the majority's new rule would require that mini-trials be conducted in which the State would be burdened with providing an explanation for

---

[6] See, e.g., *Stoudemire v. State*, 261 Ga. 49 (401 SE2d 482) (1991); *Chapman v. State*, 259 Ga. 706 (386 SE2d 129) (1989); *Hill v. State*, 259 Ga. 655 (386 SE2d 133) (1989); *Harrison v. State*, 251 Ga. 837 (310 SE2d 506) (1984); *Golden v. State*, 250 Ga. 428 (297 SE2d 479) (1982); *Respress v. State*, 249 Ga. 731 (293 SE2d 319) (1982); *Smith v. State*, 247 Ga. 453 (276 SE2d 633) (1981); *Music v. State*, 244 Ga. 832 (262 SE2d 128) (1979); *Andrews v. State*, 118 Ga. 1 (43 SE 852) (1903).

every act of violence of which the victim was accused. As was noted in reason (3) in *Henderson,* the rule against admitting evidence of specific acts of violence by the victim against third persons is intended to avoid just such a proliferation of issues.

Under prior decisions of this court, once a defendant makes a prima facie case of justification, evidence of a victim's specific acts of violence against the defendant is admissible to illustrate the defendant's contention that he reasonably believed he had to use deadly force to defend himself (*Milton v. State,* 245 Ga. 20, 22 (262 SE2d 789) (1980)), and evidence of the victim's general reputation for violence, including the victim's general reputation for a specific type of violence is admissible "to corroborate the defendant's testimony that the victim was violent on the occasion in question and to show the defendant's state of mind (reasonable fear) at the time of the incident in question." *Bennett v. State,* supra at 164. See also *Cooper v. State,* 249 Ga. 58 (287 SE2d 212) (1982); *Williams v. State,* 249 Ga. 6 (287 SE2d 31) (1982). The majority would now throw open the doors to *any* incident of violence in a victim's past, whether or not the defendant had knowledge of the victim's past indiscretions. Thus, evidence of a victim's prior violent acts directed toward third parties is now admissible simply to show the victim was a violent person and deserved to die.

I would continue to follow the well-reasoned principles of law set out in the many cases cast aside by the majority today. As a consequence, although I agree with the judgment and with the rest of the majority opinion, I cannot concur in Division 3.

I am authorized to state that Presiding Justice Smith joins in this special concurrence.

DECIDED JULY 3, 1991.

*Roger E. Douglas,* for appellant.

*Robert B. Ellis, Jr.,* District Attorney, *Robert D. Cullifer,* Assistant District Attorney, *Michael J. Bowers,* Attorney General, *Andrew S. Ree,* for appellee.