## S09A1923. JOHNSON v. THE STATE.
### (692 SE2d 575)

NAHMIAS, Justice.

Michael Johnson appeals from his convictions for felony murder and possession of a firearm during the commission of a crime, arising from the shooting death of Todd Brooks.[1] Finding no merit to Johnson's claims of ineffective assistance of counsel, we affirm.

1. The evidence at trial included the following. On the evening of November 22, 2006, Missy Brooks, the wife of the victim, was driving in her car with Shamain Grimes when she struck a deer. The Grimes and Brooks families were together that day, preparing for the Thanksgiving meal the next day. When Todd Brooks and Ted Grimes, Shamain's husband, learned of the accident, they decided to look for the deer. Ted Grimes testified that the men did not see the deer along the side of the road and so they asked permission of the landowner, Johnson, to look farther off the road. According to Grimes, Brooks knew Johnson and the other resident of Johnson's house, Roger Sturkey. Johnson agreed to help the two men find the deer and went to the back of the house to get his rifle, as Brooks and Grimes did not have a gun.

When Johnson stepped out, Rebecca Heacock, who was a life-long friend of the Brooks family, came into the room. Brooks told her she did not belong with Johnson, as she was 17 years old and Johnson was much older. Johnson then got in his truck, and Grimes, along with Brooks and Heacock, got into Grimes's truck. They began driving around the property trying to locate the deer. Grimes testified that Brooks repeatedly told Heacock that she did not belong at Johnson's house and that he wanted her to leave with him. After failing to find the deer, they drove back to Johnson's house. Heacock then agreed to leave with them, but said she needed to get her pocketbook and other things from the house.

Grimes stayed in the truck, and Brooks and Heacock walked into the house. Johnson had also returned to the house. Grimes heard Brooks tell Johnson that Heacock did not belong with him. Grimes

---

[1] The crimes occurred on November 22, 2006. On June 11, 2007, Johnson was indicted for malice murder, felony murder (with aggravated assault as the underlying felony), aggravated assault, and possession of a firearm during the commission of a crime. On January 18, 2008, a jury found Johnson not guilty of malice murder but guilty of the other crimes. On January 25, 2008, the trial court sentenced Johnson to life in prison for the felony murder conviction and a consecutive five years in prison on the possession offense. The court merged the aggravated assault conviction with the felony murder conviction. On February 6, 2008, Johnson filed a motion for new trial, which he amended on November 17, 2008. On April 7, 2009, the trial court denied the motion for new trial, as amended. On April 23, Johnson filed a notice of appeal, and on August 3, 2009, the appeal was docketed in this Court. The appeal was orally argued on November 9, 2009.

could not hear Johnson's response, but he heard Brooks say, "if that's the way you want to handle it, we'll step outside."

A short time later, Grimes heard Brooks say, "Ted, get in here." Grimes then got out of the truck and went to the doorway of the house. He saw Johnson lower his rifle at Brooks. Johnson and Brooks exchanged words, and Brooks said, "all right, I'm leaving." Brooks walked to the door to leave the house, and Johnson hit him in the back of the head with the rifle butt. According to Grimes, Brooks come back up and caught the rifle, and Brooks and Johnson started fighting over it. Grimes gained possession of the rifle by helping Brooks during the struggle.

Brooks and Johnson then began swinging at each other. At one point, they both stumbled and fell into a room that was a combination bedroom/bathroom, with Brooks falling down first and Johnson falling on top of him. Grimes testified that Johnson got up, pulled out a pistol, took a step or two back, and started shooting Brooks. Grimes then ran out of the house, with Johnson pointing the pistol at him and yelling that he needed to leave.

Deputy Reeves of the McDuffie County Sheriff's Office testified that he was the first police officer to arrive at Johnson's house. He spoke with Rebecca Heacock and discovered the victim lying on the bathroom floor. Brooks was alive, but unresponsive and bleeding profusely. Deputy Reeves found a revolver lying on the kitchen floor, and he asked Heacock to sit on the front porch and wait to speak with an investigator. For safety reasons, Deputy Reeves placed the revolver in a kitchen drawer. Reeves did not see Johnson in the house, and later discovered that Heacock left the property with Johnson.

A GBI crime scene specialist later located a .38 caliber revolver in the kitchen drawer. The revolver could fire six rounds, and all six bullets had been fired. The GBI agent found two bullets lodged in the plywood floor underneath the carpet in the bedroom/bathroom area.

Forensic evidence indicated that the bullets recovered from the victim's body and the floor of Johnson's bathroom were fired from his .38 caliber revolver. A medical examiner testified that Brooks was shot six times and died as a result. One bullet entered Brooks's right temple, just above the ear, and exited the left side of his head, traveling slightly downward or almost horizontally. There was no soot or stipling on the victim's skin, meaning that the gun was fired far enough away from him that the powder from the bullet had dissipated. The medical examiner testified that the path of the bullets was consistent with the shooter standing over the victim.

Heacock testified for the defense, stating that she had known the Brooks family a long time and that Todd Brooks was like a father to her. She stated that, when they went to search for the deer, she rode

in Grimes's truck along with Brooks, who was drinking and threat-ened to "whip [Johnson's] ass." Heacock agreed to leave Johnson's home with Brooks, but stated that she first needed to retrieve some of her things. When they arrived back at the house, Heacock and Brooks entered and Brooks told Johnson that Heacock was coming with him. Johnson said that was fine, and Brooks then stated he was going to "still whip [his] ass" and hit Johnson in the back of the head.

Johnson and Brooks began to fight and struggle over a rifle. Heacock added that Grimes gained possession of the rifle and ran out of the house. Heacock said that she did not remember exactly what happened next, but that Johnson was in the kitchen and Brooks was coming through the kitchen doorway from the bedroom/bathroom when Johnson shot him. Heacock acknowledged that Johnson was not near Brooks when he shot him. Heacock claimed that she did not see Johnson do "anything other than defend himself."

Roger Sturkey, a friend of Johnson's who also lived in the house, testified that Grimes, Brooks, and Heacock were the first to return after the unsuccessful search for the deer and that he saw Heacock enter and Brooks run in after her, while Grimes stayed outside. When Johnson returned, Sturkey told him that Brooks had run into his home and that Grimes was stretching as if getting ready for a fight. When Johnson went inside, Sturkey heard Brooks tell Johnson he was going to "kick his ass." Sturkey then saw someone push Johnson into a door and saw Brooks and Johnson struggle over a rifle. Fearing he might be shot, Sturkey ran from the house and then heard gunfire.

Johnson testified that, after everyone returned to his home after searching for the deer, Brooks told him that Heacock was leaving with him, but that Heacock said she did not want to go. Johnson told Brooks he needed to leave, but Brooks said he would not leave without Heacock. Johnson then ordered Brooks to leave, but Brooks said they needed to go outside to fight. After Brooks repeatedly challenged him to a fight, Johnson agreed to fight as a ploy to get Brooks out of the house so he could shut the door on him.

At that time, Brooks called to Grimes to come to the house. Johnson tried to let Brooks go out first, but Brooks would not do so. Brooks then tried to take the rifle that was on Johnson's shoulder, but Johnson stopped him and used his couch as a buffer between himself and Brooks. Brooks threw the couch out of the way, and Johnson, who claimed he was in fear for his life, pointed the rifle at Brooks and told him to leave.

Johnson testified that Brooks charged him and grabbed the rifle, that Grimes came into the house and the three of them struggled over the rifle, that Grimes and Brooks were hitting him, that he was

struck in the head, and that the struggle ended up in the kitchen. Johnson added that he had a revolver in a kitchen drawer and that he reached for it and picked it up but lost the rifle to Grimes. He was then fighting with Brooks, and Grimes was standing behind him with the rifle. Someone hit him hard enough to make him "see stars," and he did not think the beating would stop.

Johnson testified that Brooks was on him, that "there was nothing [he] could do," and that he had no choice but to fire the revolver. He did not take aim, but just pointed and shot as fast as he could to get "[Brooks] off of [him]." Johnson then dropped the gun and ran out the back door of the house to avoid Grimes, who still had the rifle. Johnson added that he went to his father's nearby home, and told his father he had shot Brooks.

On rebuttal, the GBI crime scene specialist testified that he found no blood evidence that was consistent with Brooks being shot in the kitchen. Instead, the forensic evidence was consistent with Brooks being shot in the bedroom/bathroom.

In addition to the charges in the indictment, the trial court instructed the jury on self-defense and voluntary manslaughter. Having observed the witnesses and considered the evidence, the jury found Johnson not guilty of malice murder but guilty of felony murder and the other crimes. Viewed in the light most favorable to the verdict, the evidence was sufficient for the jury rationally to have found Johnson guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SC 2781, 61 LE2d 560) (1979).

2. Johnson contends that his trial counsel provided ineffective assistance by failing to present evidence of an alleged prior violent act of the victim in order to support Johnson's claim of self-defense. See *Chandler v. State*, 261 Ga. 402, 407 (405 SE2d 669) (1991) (holding that, if the defendant offers evidence of justification and that the victim was the initial aggressor, the defendant also may offer evidence of the victim's specific acts of violence against third persons). The trial court disagreed, and we do as well.

To prevail on his claim of ineffective assistance of counsel, Johnson must show both that trial counsel's performance was deficient and that, but for that deficient performance, there is a reasonable probability that the result of his trial would have been different. *Wilson v. State*, 286 Ga. 141, 143 (686 SE2d 104) (2009).

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a

particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Strickland v. Washington*, 466 U. S. 668, 689 (104 SC 2052, 80 LE2d 674) (1984) (citations omitted). In short, reasonable trial strategy and tactics do not amount to ineffective assistance of counsel. *Wilson*, 286 Ga. at 143.

Johnson contends that his trial counsel's decision not to introduce the evidence of Brooks's alleged prior violent act stemmed from a misunderstanding of the type of rebuttal evidence the State could then introduce. At the motion for new trial hearing, the State introduced some letters from friends of the victim, which described their prior relationship with him as well as some good deeds he had performed in the community. The State presented the letters as but a sample of the witnesses it could have offered at trial to rebut evidence of the prior violent act. Because the letters contained some discussion of good deeds performed by Brooks, because trial counsel testified that he had learned Brooks had done "some good things in the community," and because evidence of specific good deeds unrelated to peacefulness are inadmissible to rebut *Chandler* evidence, see *Austin v. State*, 268 Ga. 602, 603 (492 SE2d 212) (1997) (to rebut *Chandler* evidence presented by the defense, the State may present evidence of the victim's "reputation for peacefulness"), Johnson contends that trial counsel based his decision not to present the *Chandler* evidence on a legal misunderstanding that the State could present evidence of specific good deeds of the victim in rebuttal.

At the motion for new trial hearing, however, trial counsel specifically explained that he did not present the *Chandler* evidence, which he had investigated, because he understood that if he did so, the State would present a "plethora of witnesses" to testify that "Mr. Brooks's *reputation* in the community was non-violent." (Emphasis supplied.) Trial counsel also testified that he thought the evidence of Brooks's prior violent act would be nullified by the State's rebuttal evidence about the victim's peaceful reputation. Moreover, the letters presented by the State demonstrate that the people who

wrote them were very knowledgeable about Brooks's character and had known him for years. It was reasonable to expect that some or all of these people could have testified about his reputation for peacefulness, not just about his general good character. One of the letters, in fact, described a specific instance of Brooks's peaceful character.

For these reasons, we reject Johnson's contention that a misunderstanding of the law led to trial counsel's decision not to introduce the *Chandler* evidence. Instead, we conclude, as did the trial court, that the decision was a matter of reasonable trial strategy and does not amount to ineffective assistance of counsel. See *Wilson*, 286 Ga. at 143.

3. Johnson contends that trial counsel was ineffective in failing to call Officer Hobbs as a witness to corroborate Johnson's testimony that he was struck on the back of the head during his struggle with Brooks. Officer Hobbs took Johnson to the jail on the night of the crimes, and he testified at the motion for new trial hearing that Johnson had a lump on the back of his head that night. We conclude, however, that, even assuming trial counsel provided deficient performance in failing to call Officer Hobbs, Johnson has not shown that, if the officer had testified, there is a reasonable probability that the outcome of the trial would have been different. See id.

In this regard, Johnson, Heacock, and Sturkey all testified that Brooks was aggressive and violent on the night of the crimes. Johnson testified that he was struck in the back of the head during the fight. Heacock testified that Brooks said he was going to "whip [Johnson's] ass" and that Brooks hit Johnson in the back of the head. Moreover, Heacock was close to Brooks and his family and considered him a father figure, lending more credence to her testimony about the victim's conduct. In addition, at the motion for new trial hearing, Officer Hobbs testified that Johnson was arrested pursuant to a "felony takedown [that] involves putting somebody on the ground." The officer added that it was possible that Johnson could have obtained the lump on his head at that time.

The testimony at trial therefore clearly conveyed that Brooks was aggressive and struck Johnson in the back of the head. If Officer Hobbs had been called to testify at trial, he or another officer could have testified about the felony takedown, which also provided another potential source of the lump. Finally, the forensic evidence demonstrated that Brooks was shot from a distance while on the floor in the bedroom/bathroom area of the house and not while standing and struggling with Johnson in the kitchen, as Johnson testified. Under these circumstances, we conclude that Johnson has failed to carry his burden to show that, if Officer Hobbs had testified at trial, there is a reasonable probability that the result of the trial would have been different. See id.

4. Johnson contends that the prosecution improperly argued to the jury in closing that he had suffered no injuries during the attack, when the prosecutor knew, from communications with Officer Hobbs, that Johnson had a lump on the back of his head when taken to the jail. Johnson, however, mischaracterizes the prosecutor's closing argument. In Johnson's closing argument, defense counsel argued that Johnson had "been beat from one end of the house to the other," that Brooks was "beating the crap" out of Johnson, and that Johnson did not have to let "somebody beat him to a bloody pulp." In responding to this part of defense counsel's closing, the prosecutor referred to a photograph of Johnson's face taken at the jail on the night of his arrest and asked if this looked like a person who had been beaten as badly as described by Johnson's defense counsel. Accordingly, we find no merit to Johnson's contention that the prosecutor engaged in an improper argument.

*Judgment affirmed. All the Justices concur.*

DECIDED MARCH 22, 2010.

*Brian Steel*, for appellant.
*Dennis C. Sanders, District Attorney, Thurbert E. Baker, Attorney General, Benjamin H. Pierman, Assistant Attorney General*, for appellee.