### 9038.   CONLEY *v.* THE STATE.

BLOODWORTH, J. 1. "A correct statement of law embraced in a charge to the jury is not erroneous because the court failed in the same connection to give to the jury other appropriate instructions. *Lucas* v. *State,* 110 *Ga.* 756 (36 S. E. 87); *Central of Georgia Ry. Co.* v. *Grady,* 113 *Ga.* 1045 (3), 1046 (39 S. E. 441); *Keys* v. *State,* 112 *Ga.* 392 (4), 397 (37 S. E. 762, 81 Am. St. R. 63); *Rawlins* v. *State,* 124 *Ga.* 31 (16), 50 (52 S. E. 1)." *Hill* v. *State,* 18 *Ga. App.* 259 (89 S. E. 351). See also *Nail* v. *State,* 125 *Ga.* 234 (2) (54 S. E. 145); *Killian* v. *State,* 19 *Ga. App.* 750 (2) (92 S. E. 227); *Barron* v. *State,* 12 *Ga. App.* 342 (2) (77 S. E. 214).

2. If fuller instructions had been desired, they should have been requested as provided by § 1087 of the Penal Code and § 6084 of the Civil Code.

3. The charge is not erroneous, as contended, "because it mixes the law of self-defense up with the law and the right to defend a mother's life."

4. "The case was not one depending wholly upon circumstantial evidence, and it furnished no ground for a new trial that the court failed to charge the law touching such evidence." *Cliett* v. *State*, 132 *Ga.* 36 (63 S. E. 626). See also *Hicks* v. *State*, 146 *Ga.* 221 (4) (91 S. E. 57); *Smith* v. *State*, 11 *Ga. App.* 89 (10) (74 S. E. 711); *Fuller* v. *State*, 10 *Ga. App.* 34 (2) (72 S. E. 515).

5. The court did not err in failing to charge on involuntary manslaughter. Involuntary manslaughter is defined in the Penal Code, § 67, in part as follows: "Involuntary manslaughter shall consist in the killing of a human being *without any intention to do so. . .*" "Wherever a homicide is neither justifiable nor malicious it is manslaughter." *Mixon* v. *State*, 7 *Ga. App.* 805 (4), 807 (67 S. E. 699). The jury, whose peculiar province it is to pass upon the facts, have said by their verdict that this homicide was neither justifiable nor malicious. Then, was it intentional? We are sure that from the evidence every unprejudiced mind must be convinced beyond a reasonable doubt that the defendant intended to kill the deceased. Immediately after the blow which felled the deceased and resulted in his death, and while standing "right at his feet," the defendant said, "I told you, God damn you, that I would kill you if you hit my mother." Here is a direct declaration from the defendant showing his intent to kill. In addition the intent may be inferred from the weapon used, an iron steelyard pea that weighed four pounds, and there is evidence to show that such a pea is a weapon likely to produce death. "Intention is often more strongly indicated by the main act than by its adjuncts. The killing of a human being with an instrument likely to produce death is a stupendous fact as a guide to intention." *Weeks* v. *State*, 79 *Ga.* 37 (3 S. E. 323). "To kill by using a deadly weapon in a manner likely to produce death will raise a presumption of intention to kill." *Moon* v. *State*, 68 *Ga.* 687 (7). See also *Hanvey* v. *State*, 68 *Ga.* 612 (4). All men are presumed to intend the natural and proximate consequences of their action. When a man kills another by the use of means appropriate to that end, he is presumed to have intended that end. "When death results from the unlawful use of a deadly weapon, the law by presumption imputes to the slayer an intention to kill." *Gallery* v. *State*, 92 *Ga.* 463 (17 S. E. 863). "When one voluntarily shoots at another and the shot kills, the homicide can not be involuntary." *Smith* v. *State*, 73 *Ga.* 79 (3). See also *Stovall* v. *State*, 106 *Ga.* 444 (3), 447 (32 S. E. 586); *Johnson* v. *State*, 4 *Ga. App.* 59 (60 S. E. 813). In each of the cases cited in the brief of plaintiff in error on this point, the evidence was not of such a character as to demand the finding that the implement was a weapon likely to produce death, and that the blow was struck with intent to kill.

6. Complaint is made that the court failed to charge certain propositions of law, though timely written requests therefor were made. In approving these grounds the judge attached a note which showed that the request was made as follows: "Request the court to charge the jury before argument and before the court charges the jury 67 1910 of Criminal Code of Georgia and section 76, 1910 Criminal Code of Geor-

gia, and 74 and 75 of the Criminal Code of 1910 of Georgia." Where several requests for instructions were made en bloc and by reference to code-sections only, and some of these were not appropriate or adjusted to the evidence, the court committed no error in refusing them; nor could they be. properly treated as written requests for definite instructions. *Wallis* v. *Heard*, 16 *Ga. App.* 802, 803 (86 S. E. 391); *Woodard* v. *State*, 18 *Ga. App.* 59 (2) (88 S. E. 825); *Grant* v. *State*, 122 *Ga.* 740 (5), 744 (50 S. E. 946); *Thompson* v. *O'Connor*, 115 *Ga.* 120 (5), 123 (41 S. E. 242). However, as far as the requests were pertinent they were covered by the charge.

7. The defendant was deprived of no defense to which he was entitled under the laws of the State or under the facts of the case. The evidence was sufficient to support the verdict of voluntary manslaughter, and the court did not err in refusing a new trial.

*Judgment affirmed.   Broyles, P. J., and Harwell, J., concur.*

DECIDED OCTOBER 31, 1917.

Indictment for murder; conviction of manslaughter; from Dougherty superior court—Judge Harrell.   June 9, 1917.

The defendant, Sam Conley, and his mother were croppers on the plantation of Melvin, who had sent for the defendant to pick cotton.   He and his mother came to the place, and were met by Melvin, who insisted on the defendant's picking cotton for him. The mother objected to this, and insisted that the defendant should pick his own cotton.   Hot words between the mother and Melvin followed.   Fannie Glover was in the lot, and Fannie White was on the porch of her home; each only a few yards away.   The former testified: "I went to the gate and I says, 'Sam, you all hush so much jawing and go on,' and Mr. Melvin told me to hush and go back and milk the cows, and I went on back, and I heard Fannie White say, 'Oh, Sam has done killed Cap'n!'   And I broke and run back to the gate, and when I got there Sam was right at his feet; and he says, 'I told you, God damn you, that I would kill you if you hit my mother.'   Mr. Melvin was lying down at that time and Sam was standing right up; and I says, 'Sam, don't hit him no more.'   I told him then to go and get Mr. Bennett. . . Mr. Melvin did not speak any more.   After Sam Conley cursed him and told him he would kill him, God damn him, he called his mother and started on down the road.   The woman, Carrie Conley, was also lying on the ground, and Sam helped her up and carried her on with him.   They both, Mr. Melvin and Carrie, lay there on the ground together, one on face and the other on back.   Carrie was not hurt, and I didn't see any sign of a

wound on her. I saw a stick and a steelyard pea lying there on the ground where Mr. Melvin was. The stick was a long slabby piece of board. I do not know just how long it was. I do not [know] what it was nor what it had been used for, but he had it then for a gate-latch. . . It only took me about a minute from the time I came to the cow-pen to where the two bodies lay. Fannie White told me that Sam knocked Mr. Melvin with the steelyard pea, that him and Carrie was tussling over the gate-latch, and Mr. Melvin slung the gate-latch loose and that Sam struck him. She said Mr. Melvin had the gate-latch and struck Carrie and knocked her down, and then the boy hit him with the steelyard pea. That is all she said at that time. She did not say that Mr. Melvin first struck her with his fist, but that he hit her one time when he flung the gate-latch away from her. She said the blow knocked her down. And then is when the boy struck him with the steelyard weight. Fannie White told me right then and there that Carrie jerked the latch out of the gate and run twixt Mr. Melvin and Sam with the latch. Carrie had the latch, and said Sam [Mr. Melvin?] grabbed the latch, and they were tussling over the latch, and when he slung her loose from the latch he knocked her with it, and she said that when he knocked Carrie that Sam knocked him with the steelyard pea. She said Carrie took the latch out of the gate and run between Sam and Mr. Melvin when she got it. That is all she said about it right then. She did not say anything about why they both had hold of it. Sam had picked up his mother and gone down the road with her when she told me this. She said that Mr. Melvin and Carrie had hold of the latch. I never asked her then and there where Carrie got the latch from." There was evidence that the steelyard pea was of iron and weighed about four pounds; that the gate-latch was about five feet long, two inches wide, and seven eighths of an inch thick; and that each was a weapon likely to produce death.

*John R. Cooper, S. B. Lippett,* for plaintiff in error.

*R. C. Bell, solicitor-general, W. I. Geer, F. A. Hooper,* contra.