### A98A0346. MURPHY v. THE STATE.
(504 SE2d 484)

McMURRAY, Presiding Judge.

Defendant Travis Santel Murphy was charged in an indictment with murder (Count 1); felony murder (Counts 2 and 3); aggravated assault (Count 4); armed robbery (Count 5); and theft by taking (motor vehicle) (Count 6). The jury found him guilty of two counts of voluntary manslaughter as lesser offenses included within the indicted charges of murder and felony murder and also found him guilty of one count of aggravated assault, arising from the same incident in which the victim, Willie Harrison III, was shot and killed by a shotgun blast at close range. The charges were merged, and defendant was sentenced to 20 years on Count 1. Defendant's motion for new trial was denied, and this appeal followed. *Held*:

1. In his first enumeration, defendant contends the trial court

---

[6] OCGA § 16-10-52 (b).

[7] 257 Ga. 775 (364 SE2d 273) (1988).

[8] See Ga. L. 1989, pp. 329, 330, § 1; OCGA § 16-10-52 (a) (5), (a.1); *Ashton*, supra, 217 Ga. App. at 338.

erred in failing to give his requested charge regarding a criminal defendant's election not to testify. Defendant did not testify at trial. He submitted a written request (defendant's No. 15) to charge the substance of the pattern jury instruction, explaining his right to remain silent and prohibiting the jury from drawing any adverse inference from his exercise of this right. See Council of Superior Court Judges, Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, Part 3 (N) (1991). From our review of the transcript of the charge conference, it appears the trial court indicated it would include defendant's Request Nos. "11, 12, 13 and 14, 15 and 16 [in its instructions to the jury because they] are pattern." But the charge as given failed to include the promised language of defendant's Request No. 15. In the face of direct inquiry by the court, defendant reserved his exceptions to the charge.

(a) The State maintains this enumeration lacks merit because defendant's requests to charge were not timely submitted. We disagree.

Defendant's requests were stamped by the clerk of the trial court as having been filed at 4:37 p.m. on December 5, 1995, which the State characterizes as being at the conclusion of the second day of trial. Defendant responds that the requests were presented to the trial court on the morning of December 5, 1995, prior to counsel's opening statements and subsequently file stamped by the clerk of the trial court.

It is not necessary to determine the precise filing time of this particular request to charge, insofar as there is no contention it was not filed until after the jury returned its verdicts. Uniform Superior Court Rule 10.3 generally requires that all requests to charge be submitted to the trial court at the commencement of trial. But that rule contains the express proviso "that additional requests may be submitted to cover unanticipated points which arise thereafter." The decision whether to testify is a tactical one made by the accused himself after consultation with counsel. *Burton v. State*, 263 Ga. 725, 728 (6) (438 SE2d 83). There is no requirement that defendant make this decision until after he has heard the State's case. Consequently, a written request to charge premised on defendant's tactical decision not to testify cannot be untimely if submitted seasonably after that decision is reached during trial and before the case is submitted to the jury. Moreover, this is not a case where the trial court ruled the requests were untimely submitted and declined to consider them. Compare *Walker v. State*, 213 Ga. App. 407, 413 (8) (444 SE2d 824); *Dortch v. State*, 204 Ga. App. 822, 823 (4) (420 SE2d 778); *Webb v. State*, 184 Ga. App. 89, 90 (2) (360 SE2d 643). Instead, the trial court in the case sub judice considered the merits of defendant's requested instructions and incorporated many of defendant's requests into the

charge. Applying the presumption of regularity attached to the actions of the trial court, we hold that defendant's written requests to charge were in fact timely submitted.

(b) "If a defendant in a criminal case wishes to testify and announces in open court his intention to do so, he may so testify in his own behalf. . . . The failure of a defendant to testify shall create no presumption against him, and no comment shall be made because of such failure." OCGA § 24-9-20 (b). See also *Bennett v. State*, 86 Ga. 401 (12 SE 806). "[A] state trial judge has the constitutional obligation, upon proper request, to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." *Carter v. Kentucky*, 450 U. S. 288, 305 (III) (101 SC 1112, 67 LE2d 241). "It necessarily follows, as a matter of logical reasoning, that when a proper charge on this subject is timely requested by the defendant, it is error for the trial judge to fail to give it." *Clay v. State*, 236 Ga. 398, 399 (224 SE2d 14). Accord *Culbertson v. State*, 193 Ga. App. 9, 11 (6) (386 SE2d 894). Compare *Woodard v. State*, 234 Ga. 901, 903 (7), 905 (7) (b), 906 (218 SE2d 629) (no error in failing to so charge, in absence of a timely written request).

(c) All charging errors are presumed to be prejudicial and harmful, and this Court will so hold, unless it appears from the entire record that the error was harmless. *Foskey v. Foskey*, 257 Ga. 736 (2), 737 (363 SE2d 547); *Austin v. State*, 218 Ga. App. 90, 91 (2) (460 SE2d 310). While the trial court did charge on presumption of innocence and burden of proof, those "other trial instructions and arguments of counsel . . . were no substitute for the explicit instruction that [defendant's] lawyer requested. . . . Without question, the Fifth Amendment privilege and the presumption of innocence are closely aligned. But these principles serve different functions. . . ." *Carter v. Kentucky*, 450 U. S. at 304 (II) (C), supra. Nevertheless, in our view of the case sub judice, the erroneous omission constitutes harmless error. Due to the overwhelming evidence of defendant's guilt, it is highly probable that defendant's failure to testify did not contribute to the verdict. The failure to give defendant's timely requested and proper instruction, under the particular circumstances of this case, was not error requiring a new trial. *Cauley v. State*, 130 Ga. App. 278, 286 (2) (a), 288 (203 SE2d 239). Compare *Clay v. State*, 236 Ga. 398, 399, supra.

2. The trial court did not err in denying the motion of defendant, who was 13 years of age at the time of the shooting, to transfer the case to the juvenile court. This motion was based on an equal protection challenge to OCGA § 15-11-5 (b), an issue which was determined adversely to defendant's contentions by the Supreme Court of Georgia in the recent decision of *Bishop v. State*, 265 Ga. 821, 823 (3) (462 SE2d 716). Moreover, defendant was charged with murder, for which

the superior court had exclusive jurisdiction pursuant to OCGA § 15-11-5 (b) (2) (A) (i), and consequently, "those statutory rights accorded juveniles in juvenile court procedures no longer appl[ied]." *Appling v. State*, 221 Ga. App. 162 (1), 163 (470 SE2d 761). Nor, in our view, did the superior court err in refusing to transfer the case to juvenile court for sentencing after defendant was convicted of an offense in which the courts would share jurisdiction. *Reynolds v. State*, 266 Ga. 235, 236 (1) (466 SE2d 218). The fourth and fifth enumerations are without merit.

3. After the close of the evidence, the trial court recessed for the charge conference. During this recess, two jurors sent out notes indicating they were already deliberating the case, even before closing arguments and the charge of the court. The trial court informed them that "[m]ost of the questions presented in [the] notes will be answered by the charge," and promptly instructed the jury "not [to] begin any deliberations until you hear the closing arguments and the charge of the Court as to the law." Defendant's second and third enumerations claim a mistrial was demanded because of the premature deliberations, complicated by the presence of the alternate jurors during those deliberations. But no such motion was made to the trial court, nor any contemporaneous objection interposed. Consequently, the errors alleged in these enumerations were not preserved for appellate review. *Peterson v. State*, 212 Ga. App. 31, 32 (2) (441 SE2d 267).

4. The trial court admitted into evidence a transcript of defendant's recorded call to the emergency 911 service, wherein defendant identified himself as "the shooter," admitting he shot his cousin Willie Harrison because the victim "kept provoking . . . and provoking . . . and provoking [defendant]." According to this transcribed call, the victim "spit on [defendant] the other night. He pushed [and] punched defendant, [and] had knives at [defendant] the other night." Then, defendant noticed the police approaching and was persuaded to surrender himself into police custody without further incident. Defendant moved to suppress this recording contending it amounted to custodial interrogation without proper cautioning of his rights. The denial of this motion is enumerated as error.

The only incriminating statement defendant made in this call was the statement "I'm the shooter." This was volunteered by defendant in response to the 911 operator's query, "Okay, who is this?" The trial court correctly admitted this evidence over defendant's objection that no warnings as prescribed by *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) preceded his volunteered statement. *Leatherwood v. State*, 212 Ga. App. 342, 343 (2) (441 SE2d 813). See also *Jenkins v. State*, 219 Ga. App. 339, 340 (1) (465 SE2d 296).

5. Investigator Jeffrey Richards of the Carroll County Sheriff's

Office testified at trial that, after the charges were upgraded to murder, he explained to defendant he would be tried as an adult "and advised him of his *Miranda* rights, [after which defendant] said that he and the victim had been arguing for a few weeks and that he [defendant] had gotten the shells to the gun sometime last week and put them in his bedroom. [Defendant] stated the victim was a bully and had been hitting on him and had spit in his face the other day. [Defendant] stated that when the argument happened [the day of the shooting] the victim had been slapping him in the face and that when [defendant] went and got the gun that the victim told [defendant] to go ahead and shoot . . . but that [defendant] thought about it and put the gun down and the argument continued. During one of the next times that [defendant] picked up the gun the victim took it away from him and held it for a while and then handed it back to [defendant] and said shoot me. During the last time that [defendant] had the gun the victim pushed [defendant] onto the couch and this caused . . . [defendant] to jerk and the gun went off."

Defendant moved to suppress this statement. At the voluntariness hearing, only Investigator Jeff Richards of the Carroll County Sheriff's Office testified, and his evidence authorized the following facts: Investigator Richards investigated "the scene of the shooting incident [and] knew there was a dead person. . . ." His first contact with defendant was at the station, where defendant was already in custody. The following chronology is undisputed: Defendant was in the custody of the Carrollton Police Department "around 3:00 p.m. or about ten minutes after." At approximately 4:30 p.m., custody of defendant was transferred from the Carrollton Police Department to the Carroll County Sheriff's Department. He was permitted to telephone his mother between "4:30 and 4:45 p.m." At 5:30 p.m., Investigator Richards contacted the juvenile court intake officer. At 6:15 p.m., Investigator Richards explained defendant's rights to him but then decided against taking a statement. But defendant persisted.

In the presence of Investigator Richards and Sergeant Howard Lee, defendant "told his mother that he had in fact shot [the victim], that [the victim] had been spitting on him. That [the victim] had taken [defendant's] [N]intendo game because the victim had accused the Defendant of taking some of his money."

Subsequently, "when the charge had been upgraded to murder [defendant] had heard a conversation between the assistant district attorney and [Investigator Richards] and said, you know, that's not the way it happened. I [defendant] want to tell my side. [Investigator Richards] prepared a *Miranda* form, read [defendant] his *Miranda* rights and was about to have him execute it [when Investigator Richards] decided at that point [and] said, I'm not going to have you [defendant] sign it [the waiver of rights form]. I don't want to take

your statement[;] you're better off not making a statement. . . . [But defendant] continued on and eventually gave a statement. Not a question/answer type thing, he just went through a statement, a brief synopsis of what had happened." Despite deciding not to have defendant sign a waiver of his rights, Investigator Richards "asked a couple of questions clarifying what he had said . . . but not what [Investigator Richards considered] an outright interrogation or [else he] would have most likely tape recorded it." Defendant never "wanted to not make a statement, [nor] wanted to stop making a statement."

Applying the nine factors enumerated in *Riley v. State*, 237 Ga. 124, 128 (226 SE2d 922), the trial court determined that the age of the accused was thirteen at the time of the incident; he was in the seventh grade; and he had knowledge of the nature of the charges against him at the time he made his initial statement to his mother on the telephone and also when he made his subsequent statement to Investigator Richards. Defendant was permitted to talk to his mother in Ohio and was not interrogated at that time. The length of the subsequent interrogation was very brief. From this the trial court concluded that defendant's initial statements to his mother were spontaneous and not in response to any custodial interrogation and that his subsequent statement to Investigator Richards was voluntary.

On appeal, defendant objects to these evidentiary rulings, contending that his statements were not spontaneous or voluntary, and further objecting because defendant was detained and interrogated without any showing of compliance with OCGA § 15-11-19 (a) (1) through (4).

(a) The trial court's determination that defendant's statements on the telephone to his mother were spontaneous and not in response to custodial interrogation is supported by the evidence, is not clearly erroneous, and consequently is affirmed. *Leatherwood v. State*, 212 Ga. App. 342, 343 (2), supra.

(b) "A child charged with a delinquent act need not be a witness against or otherwise incriminate himself. An extrajudicial statement obtained in violation of this article [Article 1, Juvenile Proceedings, OCGA §§ 15-11-1 through 15-11-66] or one which would be constitutionally inadmissible in a criminal proceeding shall not be used against such child." OCGA § 15-11-31 (b). "OCGA § 15-11-19 (a) requires a person taking a child into custody 'with all reasonable speed and without first taking the child elsewhere' to (1) release the child without bond to his custodian; (2) take the child to a medical facility when applicable; (3) bring the child immediately before the juvenile court or promptly contact a juvenile court intake officer; or (4) bring a child suspected of a delinquent act before the superior court." *Lattimore v. State*, 265 Ga. 102, 103 (2) (b), 104, n. 2 (454

SE2d 474). Inasmuch as Investigator Richards substantially complied with OCGA § 15-11-19 (a) (3) by promptly contacting the juvenile court intake officer (when the most serious charge was aggravated assault), the contention that defendant's spontaneous statements were obtained during the violation of applicable juvenile code procedures is without merit. Compare *Bussey v. State*, 144 Ga. App. 875 (1) (243 SE2d 99).

(c) As we have held in Division 2, supra, once the victim died and the charge was upgraded from aggravated assault to murder, the superior court was vested with exclusive jurisdiction under the express provisions of OCGA § 15-11-5 (b) (2) (A) (i). The juvenile code provisions no longer applied. *Appling v. State*, 221 Ga. App. 162 (1), 163, supra. Consequently, the trial court correctly determined the voluntariness of defendant's subsequent custodial statement to Investigator Richards under the criteria of *Riley v. State*, 237 Ga. 124, supra, and without regard to any alleged violation of OCGA § 15-11-19 (a). On the merits, "[t]he evidence in its entirety supports the determination that [defendant] knowingly and intelligently waived his constitutional rights. Thus, there was no error in the court ruling in favor of admissibility. *Yorker v. State*, 266 Ga. 615, 617 (4) (469 SE2d 158) (1996)." *Berry v. State*, 267 Ga. 605, 610 (8), 611 (481 SE2d 203).

6. Defendant's eighth enumeration, regarding alleged improprieties in the jury instructions on involuntary manslaughter, is without merit. Conviction of the greater offense of voluntary manslaughter renders harmless any error, although we find none, in the charge as given for the lesser offense. *Rodriguez v. State*, 211 Ga. App. 256 (1), 257 (439 SE2d 510); *Smith v. State*, 8 Ga. App. 680, 682 (2) (70 SE 42). As to the tenth enumeration, the trial court's charge on justification, when read as a whole, was a correct statement of the law. Any verbal slip could not reasonably have misled the jury. *Daniel v. State*, 224 Ga. App. 673, 675 (4) (482 SE2d 409). Nor did such verbal slip amount to an improper comment on the evidence. *Dukes v. State*, 224 Ga. App. 305, 310 (6), 311 (480 SE2d 340).

7. Defendant next contends the trial court erred in excluding evidence of the victim's prior acts of violence at school based on the administrative disposition of those incidents rather than considering the underlying facts. We disagree.

Randy Stapler was the assistant principal of Temple High School, in charge of discipline. He described Level I-type incidents as "[d]isruption in the classroom or lunchroom," whereas Level II-type incidents involved "fighting and threatening." The trial court admitted evidence of incidents "that reached Level II [but excluded] Level I because . . . they were not acts of violence."

Evidence of specific acts of violence by a victim against a third

party shall be admissible where the defendant claims justification. *Chandler v. State*, 261 Ga. 402, 407 (3) (b) (405 SE2d 669). "[T]he burden rests on the defendant to show that the prior crimes [or incidents] involved violence and were therefore relevant to a claim of justification." *Bennett v. State*, 265 Ga. 38, 40 (3), 41 (453 SE2d 458). "[A] prior bad act need not result in a criminal conviction in order to be used as a similar transaction. [Cits.] It is the similarity of the facts of the defendant's prior conduct to the facts of the case being tried that is the critical element of this type of evidence, not the adjudication of any charges which might have been brought as a result of the earlier conduct. [Cit.]" *Davis v. State*, 269 Ga. 276, 277 (2), 278 (496 SE2d 699). It is clear that the trial court in the case sub judice considered the underlying facts in its ruling, rather than the administrative disposition. "Because the [excluded incidents] do not entail any specific act of violence, they [were] not admissible under either *Chandler [v. State*, 261 Ga. 402, 407 (3), supra,] or *Wells [v. State*, 261 Ga. 282, 283 (4) (404 SE2d 106)]." *Bennett v. State*, 265 Ga. 38, 40 (3), 41, supra. This enumeration is without merit.

8. Defendant challenges the sufficiency of the evidence to support his conviction for voluntary manslaughter, contending the State did not meet its burden to rebut his claim of justification.

Ten-year-old Adrian Tremonte Harrison testified that defendant and the victim were arguing, "just yelling at each other," and not pushing or engaging in fisticuffs. Adrian Harrison saw defendant "open the closet and go in." The victim was neither "beating on [defendant, nor] [w]as he pushing him." They were no longer yelling at each other at that time. But the yelling resumed, and when Adrian Harrison looked out of his room a second time, defendant had a gun in his hands. The barrel was pointed to the ground. Then defendant "pointed it at Breeze [the victim]." The victim was not hitting or pushing defendant and did not try to get the gun away from him. "They were just sitting there for a minute[, and then defendant] pulled the trigger." The victim did not have hold of the gun and was not swinging at defendant.

According to the forensic pathologist, Thomas Young, M.D., "[b]ecause of the fact that there is a mostly circular defect [to the abdomen] the shotgun was fired at close range." In Dr. Young's medical opinion, the pattern of the wound indicated "that the shotgun blast was directed from the front part of the body to the back part of the body[, with no] evidence that the shot was fired up into the abdomen [or] chest cavity."

(a) On appeal from a criminal conviction, the evidence must be construed in the light most favorable to the jury's verdict, and the defendant no longer enjoys the presumption of innocence. An appellate court does not weigh the evidence or judge the credibility of the

witnesses but only determines whether the evidence to convict is sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560). *Hawkins v. State*, 230 Ga. App. 627, 629 (3), 630 (497 SE2d 386). Conflicts in the testimony of the witnesses, including the State's witnesses, are a matter of credibility for the jury to resolve. So long as there is some competent evidence, even though contradicted, to support each element of the State's case, the jury's verdict will be upheld. *Howard v. State*, 227 Ga. App. 5, 8 (6) (a) (488 SE2d 489).

(b) "A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person. . . ." OCGA § 16-5-2 (a).

" 'Wherever a homicide is neither justifiable nor malicious it is manslaughter.' *Mixon v. State*, 7 Ga. App. 805 (4), 807 (67 S. E. 699). The jury, whose peculiar province it is to pass upon the facts, have said by their verdict[s] that this homicide was neither justifiable nor malicious. Then, was it intentional?" *Conley v. State*, 21 Ga. App. 134, 135 (5) (94 SE 261). Whether an act is committed with the requisite criminal intent is a question for the jury "upon consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act for which the accused is prosecuted." OCGA § 16-2-6. In the case sub judice, the testimony of the eyewitness, Adrian Harrison, the forensic evidence, as well as defendant's reliance on justification in the face of alleged provocation, are sufficient under the standard of *Jackson v. Virginia*, 443 U. S. 307, supra, to authorize the inference that the shooting to which defendant admitted was intentional and without justification. The general grounds are without merit.

*Judgment affirmed. Eldridge, J., concurs and concurs specially. Blackburn, J., concurs in the judgment only.*

ELDRIDGE, Judge, concurring specially.

I concur fully with the majority's opinion. I write separately because the "harmless error" analysis in Division 1 of the majority opinion is incomplete. Such analysis turns on the omission to charge in relation to "the trial record as a whole." *Bridges v. State*, 268 Ga. 700, 703 (492 SE2d 877) (1997). Further, the "highly probable" standard used to evaluate the error in Division 1 is the wrong standard for the evaluation of error that has constitutional dimension. Here, the verdict was demanded *as a matter of law*; thus, there is no reasonable possibility that the error could have contributed to such verdict.

In most failures/refusals to charge a particular evidentiary principle (whether by ruling — or by inadvertence as in the instant case), the remaining jury charges do not "substitute for the explicit instructions that [defendant's] lawyer requested" and which the court omits/declines to give. However, *the inquiry does not end there.*

A harmless error inquiry " 'compels a judge to go beyond a first glance for affirmance or a fleeting glimpse for reversal. It compels him to exercise his mind in the exercise of his discretion, to go beyond the appearances of the result to an examination of what causal links there may be between error and the judgment.' " *Johnson v. State,* 238 Ga. 59, 61 (230 SE2d 869) (1976).

In that regard, "erroneous jury instructions are not judged in isolation, but rather are considered in the context of the entire jury charge *and the trial record as a whole. . . .* [A]n erroneous jury charge is not reversible unless it causes harm." (Emphasis supplied.) *Bridges v. State,* supra at 703.

Moreover, while the failure to charge the principle in the omitted charge at issue has constitutional dimensions, the decision in *Chapman v. California,* 386 U. S. 18 (87 SC 824, 17 LE2d 705) (1967) rejected the contention that all such errors must always be considered harmful. "The court stated that there may be some constitutional errors which are so insignificant within the *context of the factual situation of the particular case* as to render the error harmless, not requiring the automatic reversal of a conviction." (Emphasis supplied.) *LaRue v. State,* 137 Ga. App. 762, 764 (224 SE2d 837) (1976); *Little v. State,* 230 Ga. App. 803 (498 SE2d 284) (1998). " 'The question is whether there is a reasonable possibility that the [error] complained of might have contributed to the conviction.' " (Citation and punctuation omitted.) *LaRue v. State,* supra at 764; see also *Johnson v. State,* supra at 60; *Baker v. State,* 202 Ga. App. 892 (416 SE2d 295) (1992).

Thus, in light of the trial court's error in omitting Murphy's request to charge, the question in this case is whether there is a reasonable possibility that the jury gave " '*evidentiary* weight to [Murphy's] failure to testify' " so that such contributed to the verdict in the instant case. (Emphasis supplied.) *Teague v. State,* 160 Ga. App. 774, 776 (2) (287 SE2d 111) (1982), citing *Carter v. Kentucky,* 450 U. S. 288 (101 SC 1112, 67 LE2d 241) (1981). After a review of the *evidence* in this case in relation to the error, the answer is no.

Travis Murphy was indicted for murder after he shot and killed his cousin, Willie Harrison, with a J. C. Higgins 12-gauge pump action shotgun. The jury convicted Murphy of voluntary manslaughter. Murphy's defense was justification and accident, and the trial court charged on both.

In support of his defense, Murphy called six defense witnesses,

four of whom testified regarding two acts of aggression on the part of the victim. One of these witnesses testified that the victim picked up a knife during an argument with his stepmother. These witnesses did not testify as to the incident that led to the victim's death, nor did they testify regarding acts of aggression by the victim toward Murphy. However, the defense also called a DFCS caseworker] who was permitted to testify extensively as to what Murphy told her about the shooting immediately after it happened: "He [Travis Murphy] told me that he was in the house playing a video game and his cousin came in and started screaming and yelling at him that he stole his eight dollars. Travis told him he did not steal the eight dollars. His cousin kept yelling and screaming, told Travis he was going to take the video game that Travis was playing and Travis told him, no, he wasn't. At that point the cousin jerked Travis up and started pitching him around. There was some little kids in the room. Travis told the kids to leave the room. The cousin kept pushing Travis. At that point somehow Travis got a gun. He told the cousin to stop. The cousin kept coming towards him. He told him to stop or he would shoot and *at that point* the cousin told him, said, you better shoot to kill — you better shoot me and kill me because if you don't I'm going to kill you or shoot you, something to that effect." The DFCS worker testified that appellant Travis Murphy told her he was "scared" of the victim, because the victim was going to "get the gun away from him [Murphy] and shoot him." The witness testified that Murphy "didn't want to do it [shoot], but he [the victim] kept coming towards him." (Emphasis supplied.)

During the State's case-in-chief, Murphy's statement to the police also was introduced: "[H]e said that he and the victim had been arguing for a few weeks and that he had gotten the shells to the gun sometime last week and put them in his bedroom. He stated the victim was a bully and had been hitting on him and had spit in his face the other day. He stated that when the argument happened today that the victim had been slapping him in the face and that when he, Mr. Murphy, went and got the gun that the victim told Mr. Murphy to go ahead and shoot him but that he, Mr. Murphy, thought about it and put the gun down and the argument continued. During one of the next times that Mr. Murphy picked up the gun the victim took it away from him and held it for awhile and *then handed it back to the offender, Mr. Murphy and said shoot me*. During the last time that Mr. Murphy had the gun the victim pushed him onto the couch and this caused the gun — caused Mr. Murphy to jerk and the gun went off." (Emphasis supplied.)

The State also introduced Murphy's statements to his mother made while he was on the telephone at the police station: "[H]e told his mother the he had in fact shot Travis [sic], that Travis [sic] had

been spitting on him. That he had taken his [N]intendo game because the victim had accused the Defendant of taking some of his money."

In addition, an eyewitness, a ten-year-old relative of both Murphy and the victim, testified regarding the shooting. The boy testified that Murphy and the victim were arguing. There was no pushing, shoving, or fist fight — "[t]hey were just yelling at each other," Murphy left the living room and entered a bedroom closet to get the shotgun. When he returned to the living room with the shotgun, Murphy pointed it at the victim's "middle" and shot him. There was no physical contact between the two. In that regard, the pathologist testified that the victim's wound went from the middle of the abdomen to the back, as State's Exhibit 4 also shows; the doctor testified that there was no evidence of upward movement of the weapon's blast into the abdomen or chest cavity so as to support the idea that the weapon was fired from a sitting position on the couch into the victim who was standing above.

1. Here, Murphy did not "fail to testify" so as to make the omission of the challenged jury instruction reversible error. Indeed, Murphy was permitted to put his own testimony before the jury during the defense case-in-chief through the testimony of the DFCS caseworker]. Further, he did not have to be cross-examined with regard thereto. The jury heard Murphy's "side of the story" through Murphy's own statement, introduced by Murphy. In such a scenario, there is no " 'danger that the jury [gave] *evidentiary* weight to [Murphy's] failure to testify.' " (Emphasis supplied.) *Teague v. State*, supra at 776 (2).

2. *As a matter of law*, the evidence demanded a verdict of guilty of homicide:[1] (a) The evidence as presented by the State *and* the defense failed to establish the elements of a justification defense, and (b) the State's evidence overwhelmingly established the elements of homicide.

OCGA § 16-3-21 (a) states: "A person is justified in threatening or using force against another when and to the extent that he reasonably believes that such threat or force is necessary to defend himself or a third person against such other's imminent use of unlawful force; however, a person is justified in using force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent death or great bodily injury to himself or a third person or to prevent the commission of a

---

[1] Voluntary manslaughter is a homicide mitigated by passion. Accordingly, such crime demonstrates the elements of what "would otherwise be murder" if not for the additional presence of "serious provocation sufficient to excite . . . passion in a reasonable person." See Title 16, Article 5, Homicide; OCGA § 16-5-2.

forcible felony." "Two elements must be present before the use of deadly force is justified under [OCGA § 16-3-21]: (1) the danger to either the actor or a third person must be *imminent*; and (2) the actor must *reasonably* believe that such force is *necessary* to prevent death or great bodily injury to himself or a third person." (Emphasis supplied.) *Coley v. State*, 201 Ga. App. 722 (1) (411 SE2d 804) (1991).

Further, "[a] person shall not be found guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention, or criminal negligence." OCGA § 16-2-2.

(a) As a matter of law, the evidence presented by the State and the defense failed to establish the elements of self-defense or accident as a justification for the homicide.

(i) Under the evidence from both the State and the defense, Murphy's ability to withdraw from the argument with his cousin, leave the living room in order to obtain the shotgun, and return to the living room in order to pick up the argument and ultimately shoot the victim precludes as a matter of law the notion that the shooting was "necessary," an essential element of self-defense. *Veasley v. State*, 142 Ga. App. 863, 866 (237 SE2d 464) (1977); see also *Love v. State*, 194 Ga. App. 601 (391 SE2d 447) (1990).

(ii) Murphy's statement to the DFCS worker, introduced by the defense, attempted to establish self-defense as a justification for the homicide of the victim. However, the statement as a matter of law failed to establish the elements thereof, i.e., that Murphy "reasonably believed" that he was in "imminent danger of death or receiving great bodily injury" so as to justify the homicide of the victim.

Murphy told the DFCS worker that the initial physical altercation between the two men consisted of yelling and "the cousin kept pushing Travis" because "[the cousin] told Travis he was going to take the video game that Travis was playing and Travis told him, no, he wasn't." Notably, *at that point*, Murphy never stated that he felt he was in imminent danger of death or receiving serious bodily harm from the victim's actions, the essential elements of self-defense. Instead, at that point, Murphy was angry because the victim was pushing him around in an attempt to take his video game; justification goes to defense of self or others, not video games. "[S]elf-defense is not authorized unless the circumstances were such as to excite the fears of a reasonable man that his *life* was in imminent danger." (Emphasis supplied.) *Crawford v. State*, 267 Ga. 543, 544 (480 SE2d 573) (1997).

In fact, Murphy's statement to the DFCS worker shows that his fear of being in "imminent danger of death or receiving serious bodily injury," the essential elements justifying the use of deadly force, arose only *after Murphy* got the shotgun to stop the victim from get-

ting his video game. In Murphy's statement to the DFCS worker, the "necessity" for deadly force arose only because Murphy was "scared" that the victim would take the shotgun that Murphy brought into the argument over the video game and shoot Murphy with it. Thus, Murphy, himself, created any necessity for use of deadly force. Moreover, the victim's verbal threats to kill Murphy came only *after* Murphy got the shotgun and thus could not provide a basis for Murphy to obtain the weapon.

"A person is *not* justified in using force under the circumstances specified in subsection (a) of this Code section if he . . . (2) [i]s . . . committing . . . a felony." (Emphasis supplied.) OCGA § 16-3-21 (b).

Under Murphy's statement to the DFCS worker, the essential elements of self-defense, i.e., imminent fear of death or receiving great bodily injury, arose only after Murphy obtained the shotgun for use on the victim. Thus, Murphy created the necessity for use of deadly force during the commission of a felony on the victim, i.e., aggravated assault by obtaining and using a shotgun against the victim, thereby putting the victim in reasonable apprehension of receiving an immediate bodily injury. *Under the law*, Murphy's statement to the DFCS worker — introduced by the defense — does not establish the elements of self-defense as justification for the homicide of the victim.

(iii) Murphy's statement to the police, on the other hand, attempted to establish the defense of "accident," the other justification defense charged by the trial court. Murphy claimed in his police statement that the shotgun for which he had bought shells earlier; that he loaded; that he retrieved during the argument; and that he pointed at the victim just "went off" when the victim pushed him onto the couch.

However, "[t]he defense of 'accident' is defined in OCGA § 16-2-2 as the absence of a criminal scheme or undertaking, intention, or criminal negligence. 'Cocking and aiming a gun . . . at (another) . . . is an utter disregard for the safety of that person and constitutes criminal negligence,' rendering the defense of accident inapplicable. *New v. State*, 260 Ga. 441, 442 (396 SE2d 486) (1990)." *Stiles v. State*, 264 Ga. 446, 448 (2) (448 SE2d 172) (1994).

In light of Murphy's statement to the police that he obtained the shotgun shells "earlier last week" because of arguments with the victim; that he left the living room in order to obtain the loaded weapon; and that "at the time the gun was discharged[, he] was using it in [an] effort to [dissuade] the victim, the resulting homicide [did not constitute] accident." *Stiles v. State*, supra at 448 (2). "Where, as in the instant case, it is shown by the evidence, and admitted in the defendant's statement, that the homicide occurred by the discharge of a gun held by the accused which placed another in reasonable

apprehension of immediately receiving a violent injury, even if the discharge of the gun was unintentional, the offense is murder; and *in no view of such facts* does it involve accident." (Punctuation omitted; emphasis supplied.) Id. at 447-448 (2), citing *Ford v. State*, 202 Ga. 599, 602 (3) (44 SE2d 263) (1947); see also *Grude v. State*, 189 Ga. App. 901, 902 (377 SE2d 731) (1989). Accordingly, *as a matter of law*, Murphy's statement to the police does not establish the elements of accident as a justification for the homicide of the victim.

(iv) Finally, Murphy's statement to his mother does not establish the elements of either self-defense or accident. Murphy did not tell his mother that he was afraid of the victim; that he thought he was in danger from the victim; that the victim pushed or hit him; or that the shotgun "went off." Murphy's statement to his mother was that Murphy deliberately shot the victim solely because the victim spit on him and took his video game.

Thus, even taking as true the evidence introduced by the State *and* the defense, *as a matter of law*, this evidence did not establish the elements of either self-defense or accident so as to justify the homicide of the victim.

(b) The State's evidence of the elements of homicide was overwhelming.[2] The State introduced eyewitness testimony that Murphy deliberately obtained a shotgun and shot the victim without any physical provocation or threats. The State introduced expert testimony from the doctor who performed the autopsy and the firearms expert which negated the possibility that the shotgun just "went off" as recounted by Murphy to the police. Further, the State introduced Murphy's statements to his mother and the police in which Murphy admitted to the shooting but in which the elements of justification for the shooting were not established. Accordingly, the State's evidence demanded a verdict of guilty of homicide, as a matter of law.

(c) Accordingly, in light of the above, the jury could not have given "evidentiary weight" to Murphy's failure to testify so as to effect a verdict which was demanded *as a matter of law*. The failure to give the omitted jury charge, while error, was harmless.

DECIDED JULY 7, 1998 —
RECONSIDERATION DENIED JULY 28, 1998 —

*Thomason & Blackmon, Valerie C. Thomason*, for appellant.

---

[2] After three days of trial, the jury deliberated one hour before returning its verdict in the instant case.

*Peter J. Skandalakis, District Attorney, Kevin W. Drummond, Assistant District Attorney*, for appellee.