NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 17, 2024

S23A1207. ADAMS v. THE STATE.

ELLINGTON, Justice.

A Fulton County jury found Isaiah Adams ("Isaiah") guilty of malice murder and other offenses in connection with the shooting death of Laron Lowe and the aggravated assault of Ronda Dobson.[1]

---

[1] On November 22, 2016, a Fulton County grand jury returned an indictment charging Isaiah and his co-defendants Leon Adams and Malcom Pitts with murder, felony murder (three counts), aggravated assault (two counts), criminal damage to property in the first degree, and possession of a firearm during the commission of a felony. Leon and Isaiah were tried on June 11, 2018; Pitts was tried separately. On June 15, 2018, the jury found the Adams brothers guilty on all counts. On June 25, 2018, the trial court sentenced Isaiah to life in prison for malice murder, a consecutive 10-year sentence for the aggravated assault against Dobson, a concurrent 10-year sentence for first degree criminal damage to property, and a consecutive 5-year sentence for possessing a firearm during the commission of a felony. The three counts of felony murder were vacated, and a count of aggravated assault against Lowe merged at sentencing. The Adams brothers' trial counsel timely filed a motion for a new trial. New appellate counsel for Isaiah amended the motion. After hearings held on the motion for a new trial on September 9 and 21, 2021, the trial court entered an order denying the motion on April 24, 2023. A notice of appeal was timely filed on May 22, 2023, and the case was docketed in this Court for the August 2023 term and submitted for decision on the briefs. We note that Leon's appeal was docketed to the April 2023 term of court, and we affirmed his conviction in *Adams v. State,* 317 Ga. 342 (893 SE2d 95) (2023).

Isaiah contends that the State's evidence was insufficient to support his convictions beyond a reasonable doubt and that the verdicts were contrary to the "law and evidence" as well as "contrary to the principles of justice, fairness, and equity." He also contends that the trial court erred in admitting certain evidence, and that trial counsel was constitutionally ineffective. For the reasons explained below, we affirm the trial court's order denying his motion for a new trial.

The evidence presented at trial showed the following. On August 21, 2016, Lowe, who was sitting in the passenger seat of a car driven by his fiancée, Dobson, was killed when shots were fired from a white car that had followed the couple from the 29 Degrees nightclub, an after-hours club in Fulton County where they both worked. The prosecution presented video evidence, witness testimony, and the defendants' own admissions to show that Leon Adams ("Leon"), Isaiah, and Malcolm Pitts were in the white car. The State also presented evidence from which the jury could infer that the shooting may have been motivated by an argument that occurred earlier in the nightclub. The nightclub's general manager,

2

Omari Ward, testified that around 6:00 a.m., as he began ushering people out of the nightclub, a server came up to him and told him that Leon and Isaiah were arguing with a bartender over who could drink the most. Ward – who is Isaiah's cousin – approached the men and asked them to leave. Ward assumed the argument was not serious. Other witnesses testified, however, that the argument had gotten "heated" and "there was some pushing and shoving."

Ward testified that he escorted the Adams brothers outside at about 6:45 a.m. and then went back inside to work. A video recording from a security camera outside the club showed Ward stepping outside briefly with the brothers, talking with them, and then going back inside the club at 6:52 a.m. At trial, Ward identified the brothers from the video recording, which was played for the jury. He also pointed out the brothers' friend, Pitts, who was wearing a white shirt. Lowe is also visible on the video recording, but Ward testified that he did not witness any interaction between Lowe, Pitts, and the Adams brothers. Lowe, who was Ward's best friend, worked as a parking lot attendant.

Dobson worked at the nightclub as a security guard. After the nightclub closed, Dobson picked up her pay, left the building, and walked toward her black Chevy Tahoe. She testified that she stopped in the parking lot to talk to Lowe and told him she would wait for him to get off work. At about 6:55 a.m., Lowe got in the front passenger seat of Dobson's car, and the two drove off. Dobson testified that she saw a white car idling nearby, but she thought the driver was just letting her leave the parking area ahead of them. Dobson said that, as she turned left out of the parking area, she did not notice anyone behind her. Video surveillance, however, showed that the white car – later identified as a white Ford Escape – also turned left, following her. After driving a few blocks away from the club, Dobson noticed the white car pulling up along the left side of her car. She testified that, because she was driving slowly, she assumed the driver was passing her. The driver, however, pulled parallel to her car and matched her speed. Then she saw an arm extending from the open front, passenger-side window. The person wore a long-sleeved, white or light-colored shirt and held a gun in

4

his hand. And then she heard the first gunshot.

Dobson immediately turned and yelled to Lowe: "Baby, they are shooting at us." But Lowe was unresponsive, having been shot in the left temple. Dobson testified that she heard approximately four to six gunshots thereafter. The bullets shattered the driver's side windows and punctured holes in the driver's side quarter panel and the hood of the car. The driver's-side, rear caution light was also damaged by the gunfire. Dobson slowed down and stopped, but the shooting continued. When she saw the white car's brake lights come on as it slowed and then stopped, she feared the driver would turn around to come after her. She quickly backed up, turned around, and drove back to the nightclub to get help. When she arrived at the nightclub and saw that people were still outside, including Ward, she honked her car's horn and began screaming for help. Dobson got out of her car and fell to the ground, shouting: "Please don't let him be dead." Ward ran to help Lowe, but there was nothing he could do. Lowe died in the parking lot.

When the police arrived at the nightclub, Ward showed them

the video recordings from the nightclub's security cameras. As Ward looked at the recordings with the officers, he identified Pitts and the Adams brothers getting into a white Ford Escape that matched the description of the car Dobson said had followed her and Lowe. Isaiah got into the driver's seat, Pitts got into the front passenger seat, and Leon got into the back passenger seat. Ward told the police that, during the weekend before the shooting, he had seen Isaiah with a .380-caliber handgun and Leon with a pink revolver. He also testified that Pitts was known to carry a firearm, though he did not see him with one that night. After reviewing the nightclub's video recordings, Ward got into a patrol car with officers and directed them to the Adams brothers' home. When they arrived, they saw a white Ford Escape in the driveway. An officer testified that the car matched the car seen in the nightclub's security video recordings.

While Ward showed the officers where the Adams brothers lived, other officers found and gathered evidence from the roadway where Dobson said the shooting had occurred. The police recovered 11 shell casings from the roadway. They recovered five 9mm shell

6

casings, four .40-caliber shell casings, and two .380-caliber shell casings.

On August 22, 2016, the police went to the Adams home to execute an arrest warrant for Leon, who, unrelated to the shooting, had violated the terms of his probation. Officers knocked at the front door, and a woman permitted them to enter. When they showed the woman the warrant, she claimed nobody else was in the residence. But then Xavier Adams – Isaiah's twin brother – walked out and stood next to her. A detective testified that they searched the house for Leon, checking places where it was common for people to hide. The officers found Isaiah hiding on the floor in a bedroom and detained him there. They found Leon in the closet of another room, curled up inside a large storage bin. During their search for the brothers, the officers saw two handguns. They saw one of the weapons in Isaiah's room when they lifted a mattress to look under it; the other was in an open backpack on the floor of Leon's room. Upon seeing the weapons, the officers secured the residence. A few hours later, the officers obtained a search warrant for the residence.

During the search that followed, officers found several more firearms (including handguns, long guns, and semi-automatic rifles), as well as various types of ammunition. They recovered clothing that appeared to match clothing worn by the brothers on the day of the shooting as well as a paper copy of Pitts's driver's license.

The firearms recovered included a SAR Arms 9mm handgun. Further investigation revealed that this gun had been stolen from its owner a few days before the shooting. The owner testified that he kept the gun in the door panel of his truck. The last time he saw the gun was during a lunch break, when he was accompanied in his car by his coworker, Xavier Adams. The officers also recovered several cell phones during the search of the Adams home. One of those phones, which was found in Isaiah's room, had been used on the evening after the shooting to conduct over three dozen Internet browser searches for information regarding the shooting and Lowe's death.

Pursuant to a search warrant, a GBI crime scene investigator

8

processed the white Ford Escape for evidence. The investigator recovered an extended handgun magazine in the pocket on the back of the driver's seat. The magazine contained 13 .380-caliber bullets. The investigator recovered a 9mm shell casing from beneath the driver's seat and cut a piece of cloth from the interior of the car. The cloth tested positive for gunshot residue.

After Pitts was arrested, the police secured a search warrant for his residence. During the search, the police found a white hoodie matching what Pitts was seen wearing on the night of the shooting. The hoodie tested positive for gunshot residue.

The medical examiner who performed Lowe's autopsy testified that Lowe had a gunshot entrance wound to the left side of his head. The bullet traveled through his brain and came to rest against the right side of his skull. The medical examiner determined that the gunshot wound to Lowe's head was the cause of his death. The medical examiner recovered the bullet and turned it over to the GBI.

A GBI firearms examiner analyzed the ballistics evidence collected from the scene of the shooting, from the medical examiner,

and from the Adams home. The examiner determined that the 9mm shell casing recovered from beneath the driver's seat of the Ford Escape, along with three of the 9mm shell casings recovered from the scene of the shooting, were all fired from the 9mm SAR Arms pistol recovered from the Adams residence. The firearms examiner determined that the bullet recovered from Lowe's head was a .380 metal-jacketed bullet. He was unable to match that bullet to a specific firearm, however, as no comparable weapon had been recovered for testing. The examiner opined that, given the many different types of ammunition found at the scene of the shooting, it was possible that six to eight different firearms had been fired there; however, at a minimum, two different firearms were confirmed as having been used in the shooting: a 9mm and a .380-caliber weapon. He further testified that "[t]he typical firearm is going to be about the same sound [level] as a jackhammer, slightly less than the speed of sound but still loud enough to impair your hearing without hearing protection."

Before trial, Leon and Isaiah both gave recorded statements to

the police. The prosecution did not play Leon's recorded statement for the jury. Instead, a detective testified that, after waiving his rights, Leon told him that Isaiah was driving the car. Leon said that, when he got into the back seat of the car, he was drunk and tired and immediately fell asleep. He claimed he slept through the shooting. In Isaiah's statement, which was played for the jury, he confirmed that he was driving, that Pitts was in the passenger seat, and that Leon was in the back seat. Isaiah said that he, too, was drunk that night and that he was surprised when Pitts, without warning, began shooting two guns out of the passenger side window at another vehicle. Isaiah believed he heard his brother yelling something, but it was hard to tell over the gunfire.

On November 12, 2016, Leon called his mother from jail. The call, which was recorded, was played for the jury. Leon asked his mother if anyone in the home had "protection," and she confirmed that Xavier did. He asked his mother if law enforcement had obtained two items (which he did not identify directly), one of which was on top of the refrigerator and one of which was in a cabinet

11

above the refrigerator. His mother said that Xavier had removed them from the house. Leon then directed his mother to look for a folder in a filing cabinet where he hid his things. He told her to be careful where she puts her finger and not to "pull the trigger." The mother can be heard on the recording opening the cabinet drawer, laughing, and then asking Leon if the object had been there the whole time. Leon told his mother to give the object to a person named Shonda. The mother said that Shonda was there, and she put her on the phone. Leon told Shonda that the gun his mother had just found was the gun he always kept on his hip, even when he was sleeping, but that on the night before the search (which was the night following the shooting), he took the gun off his hip and put it in the cabinet. Leon commented that, had he not done so, law enforcement would have found the gun during the search. This gun was not recovered by the police.

The State also presented evidence that neither Dobson nor Lowe carried firearms with them on the night of the shooting. Dobson's car was in the body shop for almost a month, and she spent

approximately $4,500 to repair the damage done to her car by the shooters.

1. Isaiah argues that the evidence presented at trial and summarized in part above was not sufficient to support beyond a reasonable doubt his convictions for malice murder, aggravated assault, criminal damage to property, and possession of a firearm during the commission of a felony. He contends that the State failed to prove that he had any motive for shooting at Lowe and Dobson. He also argues that the evidence was entirely circumstantial and that the State failed to disprove the reasonable hypothesis that Pitts acted alone, firing two handguns from the car as he drove past Dobson and Lowe. These claims fail.

When evaluating the constitutional sufficiency of evidence, the proper standard of review is whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). This Court views the evidence in the "light most favorable to the verdict, with deference to the jury's assessment of

the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013). Under Georgia law, a person who "[i]ntentionally aids or abets in the commission of the crime" may be convicted as a party to the crime. OCGA § 16-2-20 (a), (b) (3). "Although mere presence at the scene of a crime is not sufficient to prove that one was a party to the crime, presence, companionship, and conduct before and after the offense are circumstances from which one's participation in the criminal intent may be inferred." (Citation and punctuation omitted.) *Powell v. State*, 291 Ga. 743, 744-745 (1) (733 SE2d 294) (2012).

Additionally, under Georgia statutory law, "[t]o warrant a conviction on circumstantial evidence, the proved facts shall not only be consistent with the hypothesis of guilt, but shall exclude every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-14-6. However, "not every hypothesis is a reasonable one, and the evidence need not exclude every *conceivable* inference or hypothesis – only those that are reasonable." (Citation and

14

punctuation omitted; emphasis in original). *Graves v. State*, 306 Ga. 485, 487 (1) (831 SE2d 747) (2019). "Whether alternative hypotheses are reasonable . . . is principally a question for the jury, and this Court will not disturb the jury's finding unless it is insupportable as a matter of law." *Robinson v. State*, 309 Ga. 729, 731 (1) (a) (848 SE2d 441) (2020).

The evidence was sufficient as a matter of constitutional due process for the jury to infer that Isaiah participated in the crimes and shared Pitts' and Leon's criminal intent. The Adams brothers were involved in a "heated" argument about who could drink the most inside the nightclub shortly before the shooting. The jury could infer from that argument that the brothers were intoxicated and angry after being kicked out of the club and that the argument may have motivated their actions. The jury could infer that both brothers were armed, given Ward's testimony that they had been seen just days before the shooting carrying firearms. Leon even said in a recorded jail call that he always kept a gun on his hip, even when sleeping. The jury could have inferred that the gun was the very gun

15

he asked his friend to remove from his house.

The brothers and Pitts left the club at the same time, waited together in an idling car, and then followed Dobson and Lowe from the club. Dobson testified that the driver of the car pulled his car alongside hers, matching her speed, as the shooting occurred. Isaiah stopped his car moments after Dobson stopped hers, causing Dobson to fear that the shooters would pursue her. The jury could infer from these events that Isaiah facilitated the shooting by intentionally maneuvering his car close to Dobson's. Also, given the short period of time between when the three men got into the car and when Isaiah drove the car alongside Dobson's car, the jury could infer that it was unlikely that Leon was, as he claimed, merely present, drunk, and asleep in the back seat of the car when the shooting occurred. And, given that at least two weapons were used in the shooting, the jury could infer that Leon and Pitts were the shooters.

Police recovered from the back pocket of the driver's seat, accessible to where Leon had been sitting in the back seat, an extended magazine for a .380-caliber handgun. The fatal bullet

16

removed from Lowe's head was a .380-caliber bullet. Although Isaiah was known to carry a .380-caliber handgun, and Leon may have had his own weapon strapped to his hip, the jury could have inferred that Leon fired Isaiah's gun, if not his own, because Isaiah was driving. The jury could also infer from the conversation that Leon had with his mother that Leon knew which gun was the murder weapon because he was relieved that it had not been recovered and wanted it removed from his home.

The State also proved that, in addition to the .380-caliber handgun used to shoot Lowe, a 9mm handgun was fired into Dobson's car. That handgun was discovered in the Adams home in Isaiah's room the day following the murder. Further, a cell phone seized from the Adams home following the brothers' arrests contained evidence that the phone's user had, immediately after the shooting, conducted more than three dozen Internet searches for news about the shooting. And, when the police came to the Adams home, they found Isaiah lying on the floor of his room and Leon hiding in a storage bin in a closet – facts from which the jury could

17

infer consciousness of guilt. See *Rush v. State*, 294 Ga. 388, 390 (2) (a) (754 SE2d 63) (2014) (evidence showing a defendant attempted to evade arrest is admissible as circumstantial evidence of guilt); *Michael v. State*, 335 Ga. App. 579, 585 (1) (782 SE2d 479) (2016) (attempt to hide from or elude police constitutes circumstantial evidence of consciousness of guilt).

With respect to Isaiah's assertion that he had no motive to shoot at Lowe or Dobson, the State need not introduce evidence of motive in order to support a guilty verdict on the charge of malice murder. *Romer v. State*, 293 Ga. 339, 341 (745 SE2d 637) (2013) ("[W]hile evidence of motive for the homicide is always *relevant* in a murder trial, the State is not *required* to prove the defendant's motive for killing the victim to sustain a murder conviction, since motive is not an essential element of the crime." (citations omitted; emphasis in original)). Nevertheless, the State did present some evidence of a possible motive. A witness testified that Isaiah and Leon were involved in a heated, drunken argument in the bar shortly before the shooting. Although there was no evidence that

Lowe or Dobson were involved in the argument, the jury could still have inferred, for example, that Isaiah and his passengers were angry and drunk, that they intended to retaliate against the bartender with whom they had argued, and that they mistakenly retaliated against Lowe and Dobson. A motive is simply "the reason that nudges the will and prods the mind to indulge the criminal intent." (Citation and punctuation omitted.) *Brooks v. State*, 298 Ga. 722, 726 (2) (783 SE2d 895) (2016). It was for the jury to decide what weight, if any, to give to evidence bearing on Isaiah's possible motive. See, e.g., *Jackson v. State*, 282 Ga. 668, 671 (653 SE2d 28) (2007) (Although conflicts in the evidence could have been resolved differently, the jury was authorized to accept a version of events in which the robbery was the initial motive for the crimes committed.).

The evidence here was sufficient as a matter of constitutional due process to support the jury's finding that Isaiah, acting in concert with Leon and Pitts, was a party to the crimes of malice murder, aggravated assault, and criminal damage to property, and that he was in possession of a firearm during the commission of a

19

felony. See *Jackson v. Virginia*, 443 U. S. at 319 (III) (B); *Meadows v. State*, 316 Ga. 22, 24-25 (2) (885 SE2d 780) (2023); *Williams v. State*, 313 Ga. 325, 328 (1) (869 SE2d 389) (2022). See also OCGA § 16-2-20 (a) ("Every person concerned in the commission of a crime is a party thereto and may be . . . convicted of commission of the crime.").

With respect to Isaiah's argument pursuant to OCGA § 24-14-6, even assuming that the evidence against Isaiah was entirely circumstantial, the jury was authorized to reject as unreasonable Isaiah's hypothesis that Pitts alone was responsible for the shooting, given the evidence adduced. Indeed, the more reasonable hypothesis that the jury was allowed to credit was that Pitts and Leon were the shooters and that they fired on Dobson and Lowe when Isaiah intentionally pulled his car alongside Dobson's after following them from the nightclub. See *Lowe v. State*, 295 Ga. 623, 625 (1) (759 SE2d 841) (2014) ("[Q]uestions as to the reasonableness of hypotheses other than the guilt of the defendant are generally for the jury to decide, and this Court will not disturb a finding of guilt unless the

evidence is insupportable as a matter of law.").

2. Isaiah also contends that the weight of the evidence presented at his trial does not support his convictions, and that the trial court erred in failing to grant a new trial based on the grounds set forth in OCGA §§ 5-5-20 and 5-5-21. Specifically, Isaiah contends that the trial court failed to exercise its discretion as a "thirteenth juror."

As we have stated,

[e]ven when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to [evidence and] the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. When properly raised in a timely motion, these grounds for a new trial — commonly known as the "general grounds" — require the trial judge to exercise a broad discretion to sit as a "thirteenth juror." In exercising that discretion, the trial judge must consider some of the things that she cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.

(Citation omitted.) *Wilkerson v. State*, 307 Ga. 574, 574-575 (837 SE2d 300) (2019). Though broad, the trial court's discretion is not

boundless; it "should be exercised with caution [and] invoked only in exceptional cases in which the evidence preponderates heavily against the verdict," but "it nevertheless is, generally speaking, a substantial discretion." *State v. Hamilton*, 306 Ga. 678, 684 (2) (832 SE2d 836) (2019).

The court's order denying Isaiah's motion for a new trial shows that the court exercised its discretion, considered each of Isaiah's arguments under OCGA §§ 5-5-20 and 5-5-21, and found them wanting. The record, therefore, refutes Isaiah's contention that the court failed to fulfill its role as the thirteenth juror. See *Strother v. State,* 305 Ga. 838, 843 (3) (828 SE2d 327) (2019). Having exercised that discretion, the "trial court's decision on the general grounds are not subject to our review: this Court does not sit as an arbiter of the general grounds, which are solely within the discretion of the trial court." (Citation and punctuation omitted.) *Ridley v. State*, 315 Ga. 452, 456 (3) (883 SE2d 357) (2023). Accordingly, this claim of error is without merit.

3. Isaiah contends that the trial court abused its discretion by

22

"committing errors of law warranting a new trial." More specifically, he argues that three of the court's evidentiary rulings either misstated or misapplied the relevant law or lacked a factual basis to support the court's ruling. For the following reasons, we disagree.

(a) Isaiah contends that the trial court erred in denying his motion to suppress evidence seized from the Adams home pursuant to a search warrant. Specifically, he argues that the trial court should have suppressed evidence that the officers saw when they exceeded the scope of the search for Leon.[2] Isaiah does not specify in

[2] In the two short paragraphs dedicated to this claim of error, Isaiah argues that the affidavit supporting the application for the search warrant, which was based in part on what officers had seen while executing the arrest warrant for Leon, lacked "credibility." "Although the officers technically had authority to enter the home," Isaiah argues, "the evidence was not credible that firearms were lawfully found in plain view or that the discovery of the evidence was inadvertent[.]" Isaiah appears at first blush to be challenging the truthfulness of the affidavit testimony supporting the warrant application, as well as the magistrate's decision to issue the search warrant. However, the gist of his argument, both in the trial court and on appeal, is that the evidence the officers said they saw in plain sight was only visible to them because they exceeded the permissible scope of the search for Leon pursuant to the arrest warrant.

Additionally, Isaiah does not contend that the affidavit supporting the search warrant contains a material and false representation – a claim that would trigger an analysis under *Franks v. Delaware*, 438 U.S. 154 (98 SCt 2674, 57 LE2d 667) (1978). In this case, Isaiah made no such argument below or in his appellate brief. In fact, when asked during the hearing on the motion

his appellate brief exactly what evidence should have been suppressed. In his pre-trial motion to suppress, he asserted that all the evidence seized from the home should have been suppressed, including the 9mm handgun used in the shooting and found beneath his mattress, the cellphone containing multiple searches for information about the murder of Lowe, Isaiah's identification cards, and other guns and ammunition.

> In reviewing a ruling on a motion to suppress,
>
> > an appellate court must construe the evidentiary record in the light most favorable to the trial court's factual findings and judgment. Moreover, an appellate court generally must accept the trial court's factual findings unless they are clearly erroneous, and also generally must limit its consideration of the disputed facts to those expressly found by the trial court. Although we owe substantial deference to the way in which the trial court resolved disputed questions of material fact, we owe no deference at all to the trial court with respect to questions of law, and instead, we must apply the law ourselves to the material facts.

---

to suppress whether Isaiah was challenging the validity or propriety of the warrant or the affidavit supporting the warrant, defense counsel stated: "That's not our contention judge[.] . . . I don't have any problems with the warrant itself." Rather, counsel was concerned that "these officers searched the home before that [search] warrant was issued.

(Citations and punctuation omitted.) *Westbrook v. State*, 308 Ga. 92, 96 (2) (839 SE2d 620) (2020).

Viewed in the appropriate light, the transcript of the motion-to-suppress hearing shows that Isaiah conceded that the initial entry into the Adams residence was authorized by an arrest warrant for Leon. He argued, however, that the officers went beyond the scope of a search permitted pursuant to Leon's arrest warrant and searched the residence for evidence of a crime before obtaining a warrant authorizing the search of his home. Specifically, trial counsel argued that firearms and ammunition found in the residence were not in plain view during the execution of the arrest warrant. The record, however, does not support that claim.

During the hearing on the motion to suppress, Lieutenant Derek Leader, who oversaw Clayton County's fugitive squad, testified that he was asked to assist in the execution of Leon's arrest warrant for a felony probation violation. When Leader knocked on the door, a woman answered, and Leader told her they had an arrest warrant for Leon. The woman denied anyone was home, but then

Xavier Adams appeared. As Leader and his squad entered the home, he saw a "pair of feet in the back bedroom on the left." The feet belonged to Isaiah, who was lying on the floor. After detaining Isaiah, the officers lifted the mattress in Isaiah's room to see if Leon was hiding beneath it. There, they saw several firearms. The detective testified that, in his experience, fugitives often hide in spaces between the mattress, box springs, and floor. Sometimes they even bring food and water into spaces they created while they wait for the police to leave. Leader and his squad continued their search for Leon in the next bedroom. There, they opened a closet door to find Leon in a fetal position inside a "big Tupperware container." While in Leon's room, they saw a firearm in an open backpack in the corner of the room. Upon finding Leon, the search of the home ended.

Detective Helio Garcia also testified at the hearing. He said he saw several firearms in plain view as he assisted in the search for Leon. The detective testified that, based in part on what he and other investigators had seen during their search for Leon, he immediately applied for a warrant to search the Adams home for

26

evidence related to the shooting. In his affidavit in support of the search warrant, Garcia asserted that Leon and Isaiah Adams were suspects in the shooting death of Lowe. He averred that, shortly after the shooting, Ward provided the investigators with surveillance video that showed the brothers, whom Ward had identified by name, get into a white Ford Escape that matched the vehicle described by Dobson as the one used in the shooting. Investigators then went to the Adams residence to arrest Leon on a probation violation warrant. The white Ford Escape seen in the surveillance video was parked in the driveway. When they searched for Leon to arrest him, they also found Isaiah, who had been identified as the driver of the Ford Escape. The investigators also saw several firearms in plain view when they executed the arrest warrant. Based on the facts in Garcia's affidavit, a magistrate judge issued a search warrant.

Sergeant Tiffany Thomas testified that she secured the Adams home while Garcia obtained the search warrant. Once the search warrant was returned, she assisted Garcia in executing it. She

27

testified that she also saw firearms and other evidence, including drugs and cell phones, in plain view.

During the hearing on his motion to suppress, defense counsel argued that investigators had no reason to turn over Isaiah's mattress. Counsel concluded: "It's my position that they were looking for evidence from the get-go, and because of that, I'm asking the court to suppress what was found inside of the home." The court denied the motion from the bench and later issued a written order summarily denying the motion to suppress.

Isaiah argues that it was unreasonable for the investigators to turn over his mattress while searching for Leon. Leader's testimony, however, supports the trial court's implicit finding that a fugitive might hide beneath a mattress. And if a person could reasonably hide in such a space, officers can search there. See *Maryland v. Buie*, 494 U.S. 325, 332-333 (III) (110 SCt 1093, 108 LE2d 276) (1990) (police can legally enter a person's home to execute an arrest warrant for that individual, who they reasonably believe is home at the time, and they can search any area of the home in which the

person might be found); *State v. Harris*, 246 Ga. 759, 760-761 (4)(272 SE2d 719) (1980) (The trial court did not clearly err in denying a motion to suppress drug paraphernalia found beneath a bed by officers executing an arrest warrant, given that the search was confined to places where a person could hide, and in the officers' experience, "persons hide under beds."). Isaiah has failed to show that the trial court erred in denying his motion to suppress. See *Westbrook*, 308 Ga. at 96 (2).

(b) Isaiah contends that the trial court erred in allowing the prosecutor to elicit testimony concerning Isaiah's bad character. The trial transcript shows that Ward testified that he had seen Pitts and the Adams brothers in possession of firearms in the days prior to the shooting. Following this testimony, the prosecutor asked: "And as you are looking at these guns, in what context, why were these guns out essentially?" and Ward responded, "It's like some people live that way of life." Trial counsel said "objection," and the court responded by instructing the prosecutor to move on. The prosecutor complied. Trial counsel did not seek any additional relief. Isaiah asserts that

the trial court thereafter erred by failing, on its own motion, to give a curative instruction, to strike Ward's statement, or to order a mistrial on the ground that Ward's statement was "irrelevant and extremely prejudicial" bad character evidence that was inadmissible under OCGA §§ 24-4-403 and 24-4-404.[3]

Because defense counsel did not object at trial on the specific grounds now raised on appeal, nor did he move to strike the testimony or ask for a curative instruction this claim of trial court error may only be reviewed for plain error.[4] See *Payne v. State*, 313

---

[3] OCGA § 24-4-404 (a) provides that "[e]vidence of a person's character or a trait of character shall not be admissible for the purpose of proving action in conformity therewith on a particular occasion," with certain exceptions not applicable here. Moreover, relevant evidence may be excluded under OCGA § 24-4-403 ("Rule 403") "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

[4] As this Court has previously explained:

The standard for a plain error review of rulings on evidence is that there must be an error or defect that has not been affirmatively waived by the appellant, the legal error is clear or obvious, the error must have affected the appellant's substantial rights, and if the aforementioned three requirements are satisfied, the appellate court has the discretion to remedy the found error but should do so only if the error seriously affected the fairness, integrity or public reputation of the judicial proceedings; consequently, beyond showing a clear or obvious error, the appellant must affirmatively

Ga. 218, 221-222 (1) (869 SE2d 395) (2022). Isaiah did not make a plain error argument on appeal. However, based on our review of Ward's statements, we see nothing that would support a conclusion that those statements constituted bad character evidence the admission of which was obvious error that would have affected Isaiah's substantial rights or affected the outcome of the trial, given that "[g]un ownership and the custom of carrying a gun do not, by themselves, impute bad character." (Footnote omitted.) *Davis v. State*, 272 Ga. 327, 329 (2) (528 SE2d 800) (2000). See also *Thompson v. State*, 302 Ga. 533, 543 (III) (B) (807 SE2d 899) (2017) (same).

Because Isaiah has failed to carry his burden of showing obvious error in the trial court's failure to sua sponte remedy the alleged error of the admission of Ward's statement, this claim of error fails. See *State v. Herrera-Bustamante*, 304 Ga. 259, 264 (2) (b) (818 SE2d 552) (2018) ("We need not analyze all of the elements of

show that the error probably did affect the outcome below. *Davis v. State*, 302 Ga. 576, 581 (2) n.5 (805 SE2d 859) (2017).

[the plain error] test when, as in this case, the defendant has failed to establish one of them."). See also *Bamberg v. State*, 308 Ga. 340, 352 (5) n.11 (839 SE2d 640) (2020) ("We have observed that, while an appellant need not specifically cast the alleged infirmity as plain error, parties should be advised that the hurdle to establishing plain error is high and therefore that the failure to specifically articulate how the alleged error satisfies this high standard increases the likelihood that their claims in this regard will be rejected." (citation and punctuation omitted)).

(c) Isaiah contends the trial court erred in admitting, over objection, the testimony of the witness who said that his 9mm pistol had been stolen from his truck and that Isaiah's brother, Xavier, was with him in the truck when he last saw the gun. Isaiah argues that the witness's testimony was irrelevant and prejudicial, and the trial court should have sustained counsel's objection and excluded it from the jury's consideration under OCGA §§ 24-4-403 and 24-4-404. Isaiah contends that the testimony had no bearing on the crimes for which he had been charged and was offered only to cast him in a bad

light by implying that he was part of a "crime family."

Pretermitting whether the trial court correctly determined that the testimony was admissible, any error in its admission was harmless because it is highly probable that it did not contribute to the verdicts.[5] Although the jury could infer that Xavier had stolen the gun and had thereafter given Isaiah or Leon access to it, the witness did not expressly accuse Xavier of stealing his gun, and the State never argued that Isaiah played any role in the theft of the weapon or was even aware that it had been stolen. To the extent that the witness's testimony impugns anyone's character, it impugns Xavier's, and he was not charged in this case. Further, the prosecution linked the gun to the shooting and to Isaiah and Leon

---

[5] It is fundamental that harm as well as error must be shown for reversal. The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether trial court error was harmless, we review the record de novo, and we weigh the evidence as we would expect reasonable jurors to have done so as opposed to viewing it all in the light most favorable to the jury's verdict. *Henderson v. State*, 310 Ga. 708, 713 (3) (854 SE2d 523) (2021) (citations and punctuation omitted); see also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]").

33

through other evidence admitted at trial, including ballistics evidence and the testimony of witnesses who had recovered the gun from its hiding place beneath Isaiah's mattress. Thus, weighing the evidence as we would expect reasonable jurors to have done so, we conclude that any error by the trial court in admitting the witness's testimony was harmless, as it is highly probable that any such error did not contribute to the verdicts. See *McCalop v. State*, 316 Ga. 363, 377 (5) (887 SE2d 292) (2023) (Any error in admitting evidence of the defendant's bad character was harmless, given, inter alia, the nature of the alleged incidents, other cumulative evidence, and the strong evidence of the defendant's guilt.).

4. Isaiah contends that the trial court erred in denying his motion for a new trial on the basis that his trial counsel rendered constitutionally ineffective assistance at trial. He argues that trial counsel's joint representation of Leon and Isaiah gave rise to an actual conflict of interest that prejudiced Isaiah's defense and that the joint-representation agreement they allegedly signed was insufficient to waive any conflict. He also argues that counsel's

34

performance was deficient in other respects and that the resulting prejudice required that his convictions be reversed.

(a) Isaiah argues that, because of his trial counsel's joint representation of him and his brother, he received constitutionally ineffective assistance of counsel based on an actual conflict of interests at trial. Assuming, arguendo, that the written waiver that Isaiah executed was legally insufficient to waive an actual conflict, we see no merit to his contention that his trial counsel was laboring under an actual conflict of interest.[6] Consequently, Isaiah's ineffective assistance of counsel claim fails.

> The Sixth Amendment to the United States Constitution guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." "It is well established that the right to counsel protected by the Sixth Amendment . . . is the right to the effective assistance of counsel." (Citations and punctuation omitted.) *Edwards v. Lewis*, 283 Ga. 345, 348 (2) (658 SE2d 116) (2008).
> "One component of the right to the effective

---

[6] In assuming, for purposes of evaluating this claim of error, that the waiver executed by defense counsel and the Adams brothers was invalid, we do not pretermit or assume the existence of an actual conflict of interest. See *Woods v. State*, 275 Ga. 844, 845 (2) (573 SE2d 394) (2002) (addressing question of actual conflict after assuming waiver invalid).

assistance of counsel is the right to representation that is free of *actual* conflicts of interest." (Emphasis supplied.) *Edwards,* 283 Ga. at 348 (2). Joint representation alone does not amount to an actual conflict of interest. See *Burns v. State*, 281 Ga. 338, 340 (638 SE2d 229) (2006). Rather, for purposes of evaluating an ineffective assistance claim, "'an actual conflict of interest' mean[s] precisely a conflict *that affected counsel's performance –* as opposed to a mere theoretical division of loyalties." (Emphasis in original.) *Mickens v. Taylor*, 535 U. S. 162, 171 (II) (122 SCt 1237, 152 LE2d 291) (2002). See also *Cuyler v. Sullivan*, 446 U.S. 335, 349 (IV) (B) (100 SCt 1708, 64 LE2d 333) (1980) (An actual conflict of interest is a conflict that "actually affected the adequacy of [counsel's representation.]").

(Footnote omitted.) *Adams v. State*, 317 Ga. 342, 351 (2) (893 SE2d 95) (2023). Further,

[t]o carry his burden of proving that his appellate counsel provided ineffective assistance because counsel had a conflict of interest, the defendant must show that an actual conflict of interest significantly and adversely affected counsel's representation of the defendant. The defendant need not show actual prejudice, that is, a reasonable probability that the outcome of his motion for new trial or direct appeal would have been more favorable to him if counsel had not labored under a conflict of interest. Instead, prejudice is presumed if the defendant demonstrates that the conflict of interest existed and that it significantly affected counsel's performance. In order to establish ineffective assistance arising from a conflict of interest, a defendant must show the existence of an actual conflict that adversely affected counsel's performance. . . . Further, the alleged actual conflict of interest must not be

36

"theoretical or speculative"; rather, it must be "palpable and have a substantial basis in fact.

As we review the decision of the trial court, we owe no deference to its application of the law to the facts of this case. We owe substantial deference, however, to the way in which the trial court assessed the credibility of witnesses and found the relevant facts. To that end, we must accept the factual findings of the trial court unless they are clearly erroneous, and we must view the evidentiary record in the light most favorable to the findings and judgment of the trial court.

(Citations and punctuation omitted.) Id. at 352 (2).

After hearing testimony and argument at the motion for a new trial hearing on Isaiah's contentions that his trial counsel's performance was adversely affected by the joint representation, the trial court concluded that Isaiah had shown "neither an actual conflict nor a performance deficiency caused by any such conflict." The court concluded that the brothers' defenses were not antagonistic. Their lawyer was never faced with a fundamental division of loyalties, either due to a plea opportunity for one brother but not the other or the need to pit one brother against the other. Because Isaiah failed to prove an actual conflict, that is, a conflict that adversely affected counsel's representation of him, the trial

37

court found that Isaiah had not carried his burden of proving his claim of ineffective assistance of counsel predicated on an actual conflict of interest. For the reasons set forth below, Isaiah has not shown that the trial court's ruling was erroneous.

Isaiah contends that his trial counsel knew that the State's evidence incriminated him much more than it incriminated his brother, implying that their defenses were antagonistic. He also argues that, as a result of the joint representation, counsel refrained from making decisions and pursuing trial strategies that might have benefitted him, that is, seeking a plea deal for Isaiah in exchange for his testimony against Pitts and his brother, using the brothers' "conflicting" statements and varying levels of cooperation with the police to Isaiah's benefit, and crafting a closing argument that emphasized Isaiah's mere presence during the shooting.

However, at the motion for a new trial hearing, defense counsel testified that, given the evidence in this case, especially the brothers' statements to the police, he believed that Isaiah's only plausible defense was mere presence. According to counsel, Isaiah made it

very clear that he was not going to testify against Leon, and he would not authorize a defense that painted Leon as Pitts' accomplice. The brothers steadfastly refused to incriminate each other, and they were adamant that they would not testify against each other. Further, as counsel explained, the brothers' defenses could be presented in a way that was not antagonistic: Leon was drunk and asleep in the back seat when Isaiah, the driver, was unwittingly made a participant in the shooting when Pitts fired at Lowe as Isaiah passed Dobson's car.

Additionally, neither brother expressed a desire to seek a plea deal. Nevertheless, counsel inquired whether the prosecution had any plea offers. Counsel testified that he dealt with two different prosecutors, both of whom informed him that they would only accept guilty pleas if the brothers agreed to sentences of life in prison. Neither prosecutor expressed interest in allowing either brother to plead to a lesser charge in exchange for testimony against the other defendants. Consequently, a plea deal was unavailable, even if one of the brothers had been interested in a deal and was represented

by his own attorney.

With respect to the brothers' statements, the record shows that, although they were not entirely consistent, they were not contradictory. Isaiah said he thought he heard Leon shouting over the gunfire; Leon claimed he was drunk and fell asleep in the back seat of the car. Trial counsel explained that, even if the brothers were tried separately, their respective attorneys would still have to find a way to explain Leon's statement denying any awareness of the shooting while Isaiah said that he thought he heard Leon shouting. Counsel's closing argument shows that he attempted to harmonize the statements, focusing on their consistencies, and blamed Pitts entirely for the shooting.

Given the evidence in this case, Isaiah has not shown that any of the trial court's factual findings were erroneous or that the joint representation adversely affected counsel's representation of him and, therefore, constituted an actual conflict of interest. At best, Isaiah has only speculated that counsel's efforts and strategic choices were the result of a potential conflict of interest inherent in

joint representation. Consequently, the trial court did not err in denying Isaiah's motion for a new trial on his claim of ineffective assistance of counsel predicated on an actual conflict of interest arising from his joint representation. See, e.g., *Mahdi*, 312 Ga. at 470 (3) (The defendant's claim of a conflict of interest was "at best a matter of theory or speculation" insufficient to show an actual conflict and support a claim of ineffective assistance of counsel.); *Woods*, 275 Ga. at 846 (2) (no actual conflict shown where the record fails to establish that, but for the alleged conflict, counsel "would have done something differently" (punctuation omitted)); *Henry v. State*, 269 Ga. 851, 854 (3) (507 SE2d 419) (1998) (For a criminal defendant to show counsel was ineffective due to a conflict of interest, "[t]he conflict of interest must be palpable and have a substantial basis in fact. A theoretical or speculative conflict will not impugn a conviction . . . which is supported by competent evidence." (citation and punctuation omitted)).

(b) Isaiah argues that his trial counsel was deficient for failing to investigate the possibility that a variety of different bullet

fragments and shell casings were "habitually found at the stretch of Sullivan Road where the shooting took place." He contends that the presence of such evidence would have been strategic to his defense, arguing that the "unexplained origin of certain shell casings" would support an inference that the shell casings recovered "came from an unrelated third party; that he was not involved, and did not shoot a gun at the other car." He argues that no reasonable trial strategy excuses counsel's failure to investigate or use this evidence at trial. Isaiah, however, has not proven what further investigation into that stretch of roadway would have revealed or how it would have helped his defense.

To prevail on his claims of ineffective assistance of trial counsel, Isaiah must prove both that counsel's performance was professionally deficient and that he was prejudiced by the deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984); *Terry v. State*, 284 Ga. 119, 120 (2) (663 SE2d 704) (2008). To prove deficient performance, he must show that trial counsel performed in an "objectively unreasonable

way considering all the circumstances and in the light of prevailing professional norms." *Romer*, 293 Ga. at 344 (3). "[R]easonable trial strategy and tactics do not amount to ineffective assistance of counsel." *Johnson v. State*, 286 Ga. 787, 791 (2) (692 SE2d 575) (2010). To prove prejudice, Isaiah "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden is a heavy one[.]" *Young v. State*, 305 Ga. 92, 97 (5) (823 SE2d 774) (2019). If Isaiah fails to show either deficiency or prejudice, this Court need not examine the other prong of the *Strickland* test. See *Palmer v. State*, 303 Ga. 810, 816 (IV) (814 SE2d 718) (2018).

During his closing argument, trial counsel discussed that a variety of shell casings had been found along the 1000-foot stretch of Sullivan Road. He argued that it was "illogical" to infer from that evidence that six to eight guns had been fired from a car with three people in it, one of whom was driving. "What I would submit to you,"

counsel argued, is that it was "not unusual" to find shell casings along that stretch of road. Counsel emphasized that, given the result of the State's ballistic testing, "the only thing they can conclude is that [Pitts] had" fired two weapons at Dobson's vehicle. Indeed, the trial transcript shows that the State was only able to link the shell casings found on the roadway to two weapons used in the shooting, a 9mm and a .380-caliber handgun. Trial counsel testified at the motion for new trial hearing that he did not believe another credible explanation existed for the shell casings found on the roadway, that his decision not to further investigate that evidence was strategic, and that arguing that some other, unknown party was the shooter based on shell casings found along the road would be a "last resort." Counsel consistently argued that Pitts fired two guns and that Isaiah and Leon were not involved. Under these circumstances, counsel's decision not to further investigate the presence of shell casings along Sullivan Road was a reasonable strategic decision, and such decisions do not amount to deficient performance under *Strickland*. See *Johnson*, 286 Ga. at 791 (2).

44

(c) Isaiah argues that his trial counsel was ineffective for failing to object to the introduction of evidence seized from the Adams home pursuant to a search warrant, including firearms, ammunition, cell phones, and other items. He also contends that counsel was ineffective for failing to object to the admission of photographs taken of his home during the execution of the warrant because the photographs "unfairly associated Isaiah Adams with a 'lifestyle' of guns, crime, and violence and served as inadmissible character and other bad acts evidence that would have been inadmissible under OCGA § 24-4-403 and 24-4-404[.]"

The record shows that trial counsel renewed his objection at trial to the introduction of evidence seized pursuant to the warrant, although he was not required to. See *Kilgore v. State*, 247 Ga. 70, 70 (274 SE2d 332) (1981) (defendant need not object to the admission of evidence at trial to preserve the issue for appellate review where motion to suppress has been overruled.). However, he did not specifically object to the introduction of photographs depicting where evidence was found in the Adams home. In its order denying

Isaiah's motion for a new trial, the trial court correctly found that counsel's failure to object did not constitute ineffective assistance "because the small handful of photos admitted – images of guns (including a gun used in the shooting) and ammunition, along with cell phones and ID cards – were all arguably relevant to the State's case and, even if that relevance was slight, the prejudice was similarly slight."

We agree with the trial court that the probative value of the photographs, which showed the location of some of the evidence ultimately linked to the crimes charged, was not substantially outweighed by any unfair prejudice attributable to the other guns and ammunition depicted in the photographs, given that evidence that Isaiah possessed guns and ammunition "does not impute to him generally bad character." (Citation and punctuation omitted.) *Lyons v. State*, 309 Ga. 15, 23 (5) (843 SE2d 825) (2020). See also *Harris v. State*, 313 Ga. 225, 233 (4) (869 SE2d 461) (2022) (The trial court did not err by admitting photographic evidence of weapons and ammunition officers found when defendant was arrested because

46

the evidence was relevant to the crimes committed, probative of defendant's state of mind, and was not outweighed by any unfair prejudice.). Thus, even if we were to assume that counsel's failure to object to the admission of the crime scene photographs was objectively unreasonable, Isaiah has failed to show prejudice under the facts of this case. See *Lofton v. State*, 309 Ga. 349, 361-362 (6) (a) (846 SE2d 57) (2020) (Pretermitting whether counsel's failure to object to the admission of photographs showing the defendant's Facebook username, "Rayray da Shoota," was unreasonable, defendant failed to show prejudice given the defendant was an avid basketball player as well as the defendant's guilt as a party to felony murder was strong.).

(d) Finally, Isaiah contends that his trial counsel was ineffective for failing to seek additional relief after the trial court denied counsel's objections to Ward's statement referencing a gun-owning "way of life," see Division 3 (b), and witness testimony implying that Xavier stole a 9mm handgun, see Division 3 (c).

The record shows that counsel did impose objections to the

47

witnesses' testimony but that the trial court either expressly overruled him or told the State to "move on" to another topic. Isaiah has not presented any legal argument showing that the trial court would have struck the challenged testimony or granted a mistrial had counsel sought such relief. Nor has Isaiah carried his burden of showing that the testimony, even if it was admitted in error, resulted in any prejudice to him. He has not demonstrated a reasonable probability that the outcome of the trial would have been different had the trial court excluded the testimony of either or both witnesses. Consequently, Isaiah has failed to overcome the strong presumption that his trial counsel performed reasonably and has failed to carry the heavy burden of proving ineffective assistance of counsel. See, e.g., *Strickland*, 466 U. S. at 694 (III) (B); *Young*, 305 Ga. at 97-98 (5).

*Judgment affirmed. All the Justices concur.*